UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

FURMINATOR, INC.,                    )
                                     )
        Plaintiff,                   )
                                     )
    vs.                              )        Case No. 4:08CV00367 ERW
                                     )
KIM LAUBE & CO., INC.,               )
                                     )
        Defendant.                   )


**MEMORANDUM AND ORDER**

This matter comes before the Court on Plaintiff's Motion to Strike Table 1 from the

August 14, 2009 Rebuttal Declaration of Christopher Ramsay, Ph.D. [doc. #291]; FURminator's

Motion for Summary Judgment of Infringement as to the Accused Laube Tools [doc. #322];

FURminator's Amended Motion for Summary Judgment of Validity over Kim Laube & Co.,

Inc.'s Asserted References under 35 U.S.C. §§ 102 and 103 and 35 U.S.C. § 112 [doc. #324];

FURminator's Amended Motion for Summary Judgment on Counts V through X of Kim Laube

& Co., Inc.'s Complaint [doc. #326]; Plaintiff's Motion for Summary Judgment on Count IV of

Kim Laube & Co., Inc.'s Complaint Alleging Inequitable Conduct [doc. #328]; Plaintiff's

Amended Combined Motion and Memorandum to Exclude Testimony of Edward Renner [doc.

#330]; Plaintiff's Amended Combined Motion and Memorandum to Exclude Testimony of Kim

Laube Based on the Court's December 21, 2009 Order and Because Mr. Laube's Testimony Does

Not Meet the Requirements of *Daubert* [doc. #331]; Plaintiff's Amended Combined Motion and

Memorandum to Exclude Testimony of Pamela Lauritzen Based on the Court's December 21,

2009 Order and Because Ms. Lauritzen's Testimony Does Not Meet the Requirements of

*Daubert* [doc. #332]; Plaintiff's Amended Motion to Exclude or Limit Testimony of Robert O. Schick and Memorandum in Support [doc. #333]; Plaintiff's Amended Motion to Exclude or Limit Testimony of Shawn Fox and Memorandum in Support [doc. #334]; Plaintiff's Motion to Exclude or Limit Testimony of Dr. Christopher Ramsay and Memorandum in Support [doc. #335]; Defendant Kim Laube & Co., Inc.'s Motion for Partial Summary Judgment Relating to No Evidence of Infringement [doc. #341]; Plaintiff's Amended Motion and Memorandum in Support to Strike or in the Alternative to Exclude Paragraph 7 from the July 30, 2009 Supplemental Declaration of Pamela Lauritzen [doc. #343]; Defendant's Motion *In Limine* to Exclude Testimony from Plaintiff's Retained Expert David H. Judson [doc. #344]; Kim Laube & Co.'s Motion [to] Strike Untimely Replies [doc. #382]; and Kim Laube & Co., Inc.'s Motion and Memorandum for Sanctions Based on Plaintiff's Knowing and Willful Filing of False Statements [doc. #384].

## I.      BACKGROUND

On February 26, 2008, FURminator, Inc. filed suit against Munchkin, Inc. and Kim Laube & Co., Inc., in the Eastern District of Texas. The lawsuit involved allegations of infringement of United States Patent 7,334,540 ("the '540 Patent"). The '540 Patent protects the alleged invention of David R. and Angela L. Porter, specifically a pet grooming tool that quickly and effectively removes loose hair from pets, such as dogs and cats, to reduce shedding. The '540 Patent is the fourth patent in a series of related patents, the first of which was United States Patent 6,782,846 ("the '846 Patent").

Shortly after FURminator, Inc. filed its lawsuit in the Eastern District of Texas, Munchkin, Inc. and Kim Laube & Co., Inc. filed this lawsuit against FURminator, Inc. and

PorterVision, Inc., in the Eastern District of Missouri. Munchkin, Inc. and Kim Laube & Co., Inc.'s lawsuit sought declaratory judgments for noninfringement and invalidity of the '540 Patent, and also alleged various non-patent claims. FURminator, Inc. and PorterVision, Inc. filed a motion with this Court, seeking to have the Missouri case transferred to the Eastern District of Texas, but the motion was denied. Thereafter, the Parties agreed that FURminator, Inc. would voluntarily transfer its Texas case to the Eastern District of Missouri, to be consolidated with this pending case. The Parties were also realigned so that FURminator, Inc. and PorterVision, Inc. would be the plaintiffs in this case, and Munchkin, Inc. and Kim Laube & Co., Inc. would be the defendants in this case. On October 8, 2009, PorterVision, Inc. was dismissed from the case, without prejudice, leaving FURminator, Inc. ("Plaintiff") as the sole plaintiff in this case. On December 7, 2009, this Court entered final judgment for Plaintiff and against Munchkin, Inc., pursuant to a consent motion filed by Plaintiff and Munchkin, Inc. Thus, Kim Laube & Co., Inc. ("Defendant") remains as the sole defendant in this case.

The pending motions were all filed between December 4, 2009 and July 8, 2010. Before the Court was able to rule any of the motions, on July 29, 2010, Defendant filed a Suggestion of Filing Bankruptcy. As a result, the Court automatically stayed the case on August 2, 2010, pending the conclusion of bankruptcy proceedings, and temporarily termed the pending motions. Subsequently, on September 20, 2010, Plaintiff filed a Notice of Bankruptcy Order Granting Relief from the Automatic Stay, which included a copy of an order from the United States Bankruptcy Court for the Central District of California, granting a motion filed by Plaintiff for relief from the automatic stay under 11 U.S.C. § 362. This Court then lifted the stay and reinstated all termed motions on October 28, 2010.

The motions currently pending before the Court consist of several motions for summary judgment (four filed by Plaintiff and one filed by Defendant), and numerous motions to exclude evidence or testimony. The Court will consider the motions for summary judgment in full, and will address the remaining motions as needed.

## II.    LEGAL STANDARD FOR MOTIONS FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment only if all of the information before the court shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those "that might affect the outcome of the suit under the governing law," and a genuine material fact is one "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the non-moving party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23.

The initial burden of proof on a motion for summary judgment is placed on the moving party to establish "that no genuine dispute exists over a material fact." *Meyers v. Asics Corp.*, 974 F.2d 1304, 1306-07 (Fed. Cir. 1992). Once this burden is discharged, if the record does in fact bear out that no genuine dispute exists, the burden shifts to the non-moving party to set forth affirmative evidence and specific facts showing there is a genuine dispute on that issue. *See Anderson*, 477 U.S. at 250; Fed. R. Civ. P. 56(e)(2). When the burden shifts, the non-moving

party may not rest on the allegations in its pleadings, but, by affidavits and other evidence, must set forth specific facts showing that a genuine issue of material fact exists. *See Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1377 (Fed. Cir. 2002); Fed. R. Civ. P. 56(e)(1). The non-moving party does not need to produce "evidence in a form that would be admissible at trial in order to avoid summary judgment," rather, "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred." *Celotex*, 477 U.S. at 324.

To meet its burden and survive summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the non-moving party must show there is sufficient evidence favoring the non-moving party which would enable a jury to return a verdict for it. *See Anderson*, 477 U.S. at 249; *Celotex*, 477 U.S. at 334. If the non-moving party is unable to do so, summary judgment is proper. *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1318 (Fed. Cir. 2003).

## III.    MOTIONS FOR SUMMARY JUDGMENT ON INFRINGEMENT

Plaintiff and Defendant each filed separate motions for summary judgment regarding Plaintiff's infringement claims. Plaintiff filed FURminator's Motion for Summary Judgment of Infringement as to the Accused Laube Tools [doc. #322], while Defendant filed Defendant Kim Laube & Co., Inc.'s Motion for Partial Summary Judgment Relating to No Evidence of Infringement [doc. #341]. Plaintiff requests that the Court find that the Laube Qwik-Change

tool, the Laube Lazor Adjustable Blade Rake tool, and the Laube iVac tool (collectively, "Accused Tools") infringe the '540 Patent. Defendant requests that the Court find that the Accused Tools do not infringe the '540 Patent.

## A.    STATEMENT OF FACTS[1]

Before the Court begins its recitation of the facts relevant to the motions for summary judgment on infringement, it is important to note that Federal Rule of Civil Procedure 56(c) requires that

> [a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record . . . or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Additionally, the Local Rules of this Court provide:

> A memorandum in support of a motion for summary judgment shall have attached a statement of uncontroverted material facts, set forth in a separately numbered paragraph for each fact, indicating whether each fact is established by the record, and, if so, the appropriate citations. Every memorandum in opposition shall include a statement of material facts as to which the party contends a genuine issue exists. Those matters in dispute shall be set forth with specific references to portions of the record, where available, upon which the opposing party relies. The opposing party also shall note for all disputed facts the paragraph number from movant's listing of facts. All matters set forth in the statement of the movant shall be deemed admitted

_____

[1]The Court's recitation of the facts is taken from Plaintiff FURminator's Statement of Uncontroverted Material Facts Concerning its Motion for Partial Summary Judgment of Infringement as to the Laube Accused Products [doc. #323-1], and Plaintiff FURminator's Statements of Uncontested Fact in Support of its Memorandum in Opposition to Kim Laube & Co.'s Motion for Partial Summary Judgment Relating to No Evidence of Infringement [doc. #349-1]. The Court also considered the exhibits submitted by the Parties, where appropriate.

The Court notes that the facts contained in this section apply only to the Court's analysis of the two motions for summary judgment regarding Plaintiff's infringement claims.

for purposes of summary judgment unless specifically controverted by the opposing party.

Local Rule 7-4.01(E).  Local rules such as this are implemented in order to prevent district courts from having to "scour the record looking for factual disputes."  *Nw. Bank & Trust Co. v. First Ill. Nat'l Bank*, 354 F.3d 721, 725 (8th Cir. 2003).

In this case, Defendant did not include a statement of uncontroverted material facts with its Motion for Summary Judgment, nor did Defendant properly respond to Plaintiff's statement of uncontroverted material facts, filed in conjunction with its Motion for Summary Judgment. As a result, Defendant did not specifically controvert any of the facts set forth by Plaintiff in either of its statements of fact (one was offered in support of Plaintiff's Motion for Summary Judgment, while the other was offered in support of Plaintiff's opposition to Defendant's Motion for Summary Judgment).  Pursuant to the Local Rules of this Court, the Court will deem admitted each fact contained within Plaintiff FURminator's Statement of Uncontroverted Material Facts Concerning its Motion for Partial Summary Judgment of Infringement as to the Laube Accused Products [doc. #323-1], and each fact contained within Plaintiff FURminator's Statements of Uncontested Fact in Support of its Memorandum in Opposition to Kim Laube & Co.'s Motion for Partial Summary Judgment Relating to No Evidence of Infringement [doc. #349-1].  This determination is made only for the purpose of the Court's consideration of Plaintiff FURminator's Motion for Summary Judgment of Infringement as to the Accused Laube Tools [doc. #322] and Defendant Kim Laube & Co., Inc.'s Motion for Partial Summary Judgment Relating to No Evidence of Infringement [doc. #341].

Turning now to the facts of this case, Plaintiff is an innovative St. Louis-based company formed by Angela and David Porter in 2002. Plaintiff imports and sells a variety of pet grooming products, including FURminator pet grooming tools ("FURminator DeShedding Tools"). In the 1990s, Angela Porter owned a dog groomer salon and experienced on a day to day basis the tedious and difficult task of removing shedding hair from dogs. In the late 1990s, David and Angela Porter conceived of an invention for quickly and effectively removing unwanted loose hair from dogs and cats to reduce shedding. They developed prototypes of their invention and ultimately filed a patent application in 2000. The application eventually issued as U.S. Patent 6,782,846 ("the '846 Patent"), which is owned by Plaintiff. Plaintiff also owns U.S. Patent 7,334,540 ("the '540 Patent"), which is a patent related to the '846 Patent. The FURminator DeShedding Tools have been enormously successful and are now sold around the world to pet groomers and non-groomers alike.

The '540 Patent has 78 claims. Of the 78 claims, seven are independent claims. Claim 1 of the '540 Patent is an independent claim that requires:

1. For use with a furry pet such as a dog or cat having loose hair and non-loose hair, a pet grooming tool for removing the loose hair from the pet, the grooming tool comprising:
a handle portion, the handle portion having a recess;
a pet engageable portion secured to the handle portion, the pet engageable portion including a blade portion and a plurality of teeth, the blade portion comprising a leading surface and a trailing surface defining a blade edge, at least one of the teeth extending from the blade edge, the pet engageable portion being partially positioned within the recess of the handle portion;
the blade edge being adapted to engage the loose hair of the pet and pull it from the pet without cutting or pulling the non-loose hair from the pet as the pet engageable portion is moved in a first direction while the pet engageable portion is in engagement with the pet, the first direction being a direction in which the trailing surface trails the leading surface.

Claim 63 of the '540 Patent is also an independent claim that requires:

> 63. For use with a furry pet such as a dog or cat having loose hair and non-loose hair, a pet grooming tool for removing the loose hair from the pet, the grooming tool comprising:
> a handle portion;
> a pet engageable portion secured to the handle portion, the pet engageable portion including a blade portion and a plurality of teeth, the blade portion comprising a leading surface and a trailing surface defining a blade edge, at least one of the teeth extending from the blade edge, the handle portion surrounding a portion of the pet engageable portion;
> the blade edge being adapted to engage the loose hair of the pet and pull it from the pet without cutting or pulling the non-loose hair from the pet as the pet engageable portion is moved in a first direction while the pet engageable portion is in engagement with the pet, the first direction being a direction in which the trailing surface trails the leading surface.

The '540 Patent contains both apparatus and method claims. Both Claim 1 and Claim 63 are apparatus claims. Each of the apparatus claims of the '540 Patent, including Claim 1 and Claim 63, require:

> the blade edge being adapted to engage the loose hair of the pet and pull it from the pet without cutting or pulling the non-loose hair from the pet as the pet engageable portion is moved in a first direction while the pet engageable portion is in engagement with the pet, the first direction being a direction in which the trailing surface trails the leading surface.

Defendant currently sells at least three Accused Tools: the Laube Qwik-Change tool, the Laube Lazor Adjustable Blade Rake tool, and the Laube iVac tool. The Qwik-Change tool is sold with several different-sized pet engageable portions (small, medium, and large), that are all similar in design. The only significant difference between the various sizes is the width of the pet engageable portions. Otherwise, the design of the pet engageable portion on each of the different sizes appears to be the same. Each of the Accused Tools has a handle portion, which is a portion of the tool that the user holds. Each of the Accused Tools also has a pet engageable

portion, which is a metal portion that is used to engage the pet, that has more than one tooth and a leading surface and a trailing surface that meet to form a blade edge.  The pet engageable portion on the Qwik-Change tool is secured within a portion of the handle portion.  In both the iVac and the Lazor Blade tools, the pet engageable portions are fixed to the handle portions by screws.  As to the Qwik-Change and Lazor Blade tools, securing the metal pet engageable portion to the handle portion results in a portion of that metal pet engageable portion being surrounded by the handle portion.  As to the iVac tool, the device is adapted to receive a metal pet engageable portion in a recess or indentation in the handle.  When a pet engageable portion is placed in the recess of the iVac tool, such a pet engageable portion is partially positioned within the recess of the handle.  For each of the Accused Tools, the teeth of the metal pet engageable portion project or extend from the blade edge.  When in use, the pet engageable portion of each of the Accused Tools is designed to be pressed against the fur of the pet.  The user then pulls the Accused Tools in the direction the handle is pointing.  When pulled in the direction the handle is pointing, the leading surface leads the trailing surface of the blade portion.  Defendant's advertisements admit that the Accused Tools are designed to be used with shedding breeds of dogs and cats to remove loose hair, and that the Accused Tools are all deshedding tools or "de-shedders."

Pets such as dogs and cats have active and growing hair, also known as anagen hairs, and inactive and not growing hairs, also known as telogen hairs.  Most dogs and cats are considered to be telogen dominant, meaning that under normal circumstances those animals possess more hair that is in the telogen phase of the hair cycle.  Plaintiff's veterinary dermatologist, Dr. Helen Globus, tested each of the Accused Tools.  Dr. Globus conducted two tests: 1) she tested the

tools on furry pets that were patients in her clinic and inspected hairs removed to determine if the Accused Tools pulled active and growing anagen hair; and 2) she used the Accused Tools on human hair (as a proxy for pet hair) to determine whether the tools cut active and growing anagen hair. Based on her testing, Dr. Globus determined that, when used according to the directions, the blade edge of the Accused Tools do not cut or pull anagen hairs.

For the first test, Dr. Globus examined hairs removed from numerous test cases. She used the Accused Tools to remove hair, collected that hair, mounted the slides under a microscope, and examined the hair under a microscope. A pulled hair is likely to have an intact root, and an examination of the hairs with intact roots is the only way to determine the condition of the hairs pulled from the pet (i.e., where those hairs are in the hair life cycle). Dr. Globus discovered five hairs at most that could not be positively identified as telogen hairs, but she ultimately determined that these five hairs had no effect on her conclusions. She explained that there are several reasons why a few anagen hairs may be present in the samples. One such reason is that animals self-groom (lick, bite, scratch, etc.), and may pull out hairs on their own without the aid of the Accused Tools or similar products. Dr. Globus also reasoned that if tools like the Accused Tools were pulling out anagen hairs, she would expect to see many anagen hairs pulled out with every stroke. Thus, based on the results of this first test, Dr. Globus concluded that the Accused Tools pull telogen hairs, but do not pull anagen hairs.

Having determined that the Accused Tools do not pull out anagen hairs, Dr. Globus next set out to determine whether the Accused Tools cut anagen hairs. While testing the Accused Tools on furry pets, she observed none of the usual signs of cutting hair, such as cutting noises or cutting lines in the animal's coat. In order to test her theory that the Accused Tools do not cut

hair, she had to employ a different test than the test described in the preceding paragraph because cut or broken hairs are commonly found on pets.[2]  There are numerous reasons why cut hairs might be found in samples collected from pets.  As noted above, furry pets have a tendency to self-groom their hair, potentially resulting in broken hairs that would not be attributable to the Accused Tools.  Broken hairs may also be caused by poor nutrition or the prior use of grooming devices like electric clippers.  Alternatively, pets may come into contact with objects such as bushes that cause cut or broken hairs.  Both parties' experts were largely in agreement as to the potential causes for cut hairs.

So, to determine whether the Accused Tools cut hair, Dr. Globus drew the Accused Tools through hair on a human head that was of similar length to a dog or cat's hair.  Human scalp hair is predominately anagen, meaning that most of the hair on a human head at any one time is in the anagen phase of the growth cycle.  The structure of human hair is similar to that of a dog or cat, but human hair lacks a secondary undercoat.  Dr. Globus recognized that differences exist between human hair and dog or cat hair, but she found these differences to be immaterial for the purpose of determining whether the Accused Tools cut hair.  She reasoned that if multiple draws through the same portion of human hair (more than one draw may be necessary because loose

_____

[2]Dr. Globus concluded that cut or fractured hairs are naturally found on furry animals, based on her observations of the use of a trichogram.  She stated,

> "A trichogram is a regular aspect of a veterinary dematologist practice.  Hairs collected for a trichogram are obtained by using a hemostat to pluck hairs.  These plucked hairs are then examined under a microscope.  I have obtained countless numbers of trichograms during my practice.  Often, when I examine the plucked hairs under a microscope, I see hairs that have been cut or broken.  It is my opinion that cut or broken hairs are found naturally on pets."

(Third Expert Report of Helen Globus, DVM, doc. #342-33, p.3).

hairs may be present) resulted in *no* hairs removed, then the tool cannot be cutting hairs, anagen or otherwise. Dr. Globus observed that multiple draws through human hair ultimately resulted in no hairs removed. This observation, coupled with her observation that the Accused Tools do not cause cut lines or cutting noises, permitted Dr. Globus to conclude that the Accused Tools do not cut anagen hairs.

Defendant's expert Dr. Robert O. Schick also conducted an analysis of the Accused Tools. Dr. Schick's cutting analysis was based on tests similar to Dr. Globus's pulling test. Dr. Schick was not in a position to exclude external factors for cut or broken hairs because he did not personally witness the testing. Additionally, Dr. Schick did not discuss the testing with those individuals who collected samples, Pamela Lauritzen and Kim Laube, nor did he personally observe the condition of the animals prior to testing. Dr. Schick also could not obtain a "patient" history, checking for complicating medical factors. Dr. Schick merely examined the samples provided to him without any other information for reference beyond the sample identification on the outside of the envelope.

### B.    EVIDENTIARY ISSUES

As previously mentioned, in conjunction with the filing of the pending motions for summary judgment, the parties also filed a series of motions to exclude evidence or testimony, which the Court will address as needed. Before proceeding to the analysis of the motions for summary judgment on infringement, it is necessary for the Court to address Plaintiff's Amended Motion to Exclude or Limit Testimony of Robert O. Schick and Memorandum in Support [doc. #333].

In support of its Motion to Exclude, Plaintiff argues that Dr. Schick's testimony should be excluded as a result of this Court's December 21, 2009 Order, which imposed the following sanctions on Defendant:

1)      All testimony of Mr. Kim Laube, given as an expert or layperson, is stricken.

2)      All documents and tools that Mr. Laube has relied on are excluded.

3)      All other expert testimony that relies on Mr. Laube's testimony, documents, or tools is excluded.

4)      Defendant is prevented from otherwise relying on any of the above listed materials in any way in this matter.

(Order, doc. #313, p.8). Plaintiff argues that some of the hair samples that Dr. Schick used in his testing were provided by Mr. Laube, and that the tools that were used by Pam Lauritzen to gather hair samples (that were later provided to Dr. Schick for testing) were also provided by Mr. Laube.

The Court agrees that Dr. Schick's opinions based on any hair samples collected by Mr. Laube should be excluded, but it is not entirely clear that Mr. Laube actually collected hair samples for Dr. Schick. Plaintiff cites paragraphs 31 and 32 of the July 30, 2009 Report of Dr. Schick [doc. #342-29] in support of its assertion that Mr. Laube provided hair samples to Dr. Schick. However, this portion of the Report merely states that Dr. Schick examined hair samples that were removed from Mr. Laube's dog, Kodi. While it seems likely that Mr. Laube was the person who collected the samples, the Court cannot reach this conclusion with certainty. Additionally, the Court is unable to verify Plaintiff's assertion that Mr. Laube provided the tools used by Pam Lauritzen to gather hair samples. Plaintiff cites paragraphs 26-30 of the July 30, 2009 Report of Dr. Schick in support of this assertion, but the Court reviewed this portion of the

Report and was unable to locate any language that supports the assertion. The source of the tools is not discussed at all in any of Dr. Schick's three reports (the July 30, 2009 Report, the August 10, 2009 Supplemental Report, or the August 14, 2009 Rebuttal Report). Thus, the Court is not inclined to exclude Dr. Schick's opinions on this basis alone.

Plaintiff also argues that Dr. Schick's opinions should be excluded under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), because they are unreliable and untrustworthy. Federal Rule of Evidence 702 sets forth the standards for determining if expert opinion testimony is admissible:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Thus, "*Daubert* requires the district court [to] ensure that any scientific testimony 'is not only relevant, but reliable.'" *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010) (quoting *Daubert*, 509 U.S. at 589).

The initial question of whether expert testimony is sufficiently reliable is to be determined by the court, as part of its gatekeeper function. *Daubert*, 509 U.S. at 593 (citing Fed. R. Evid. 104(a)). The Supreme Court provided a number of factors a court is to consider in determining whether expert testimony should be presented to the jury, including: 1) whether the theory or technique can be, and has been, tested, 2) whether the theory has been subjected to peer review and publication, 3) the known or potential rate of error, and 4) whether the theory or

technique is generally accepted in the relevant community.  *Id.* at 593-94.  Additionally, as

recognized in the 2000 Advisory Committee Notes to Federal Rule of Evidence 702,

> [c]ourts both before and after *Daubert* have found other factors relevant in
> determining whether expert testimony is sufficiently reliable to be considered by the
> trier of fact.  These factors include:
>
> (1) Whether experts are proposing to testify about matters growing naturally and
> directly out of research they have conducted independent of the litigation, or whether
> they have developed their opinions expressly for purposes of testifying.
>
> (2) Whether the expert has unjustifiably extrapolated from an accepted premise to an
> unfounded conclusion.
>
> (3) Whether the expert has adequately accounted for obvious alternative
> explanations.
>
> (4) Whether the expert is being as careful as he would be in his regular professional
> work outside his paid litigation consulting.
>
> (5) Whether the field of expertise claimed by the expert is known to reach reliable
> results for the type of opinion the expert would give.
>
> All of these factors remain relevant to the determination of the reliability of expert
> testimony under the Rule as amended.  Other factors may also be relevant.

Fed. R. Evid. 702 advisory committee's note (internal quotations and citations omitted).

Plaintiff has asked this Court to act as gatekeeper and exclude Dr. Schick's testimony as

not sufficiently reliable.  The main issue with Dr. Schick's opinion is with respect to his

conclusion that the Accused Tools and the FURminator DeShedding Tools all cut non-loose hair

from furry pets.  Dr. Schick opined that these tools all cut pet hair based on his observation that a

number of cut or fractured hairs were present in the samples he tested.  (Expert Report, doc.

#342-29, p.9 ¶37).  However, Dr. Schick's opinion does not properly account for the presence of

cut or fractured hairs that were caused by circumstances not related to the use of the tools at issue

in this case. All of the proposed experts involved in this case agree that cut or fractured hairs can be found on furry pets for numerous reasons, including: self-grooming, rubbing against certain objects like bushes, poor nutrition, and past use of certain grooming devices.

Dr. Schick's opinion that the tools cut hair was based on tests he performed on pet hair samples that were mostly provided by counsel for Defendant. It is undisputed that Dr. Schick was not present when the samples were collected and that he did not have the opportunity to personally observe the animals, or the condition of their coats, prior to testing. He also did not have a "patient" history for the pets that might have revealed medical conditions that could affect the testing. Additionally, for the few samples that Dr. Schick personally did obtain, he did not give any indication that he took steps to eliminate pre-existing cut or fractured hairs from the pet's coat before taking the sample. Thus, Dr. Schick did not effectively eliminate alternative explanations, which is a significant factor for this Court to consider when screening for reliable expert testimony. *See* Fed. R. Evid. 702 advisory committee's note (noting that in performing role as gatekeeper, district court can consider "whether the expert has adequately accounted for obvious alternative explanations").

Additionally, Dr. Schick's explanation for his opinion was insufficient. At first, Dr. Schick admitted that he was not able to distinguish a hair that was cut or fractured by one of the tools at issue as opposed to a hair that was cut or fractured due to other reasons. (Schick Deposition, doc. #342-8, p.34 l.10-15). However, he later changed his testimony to state that it can be "difficult to differentiate the two," but generally he can determine the cause of a cut or fractured hair based on whether there is a clean cut or apparent trauma. Dr. Schick was questioned about existing support for his theory, but he was unable to cite to any. (Schick

Deposition, doc. #342-8, p.78 l.21-p.80 l.25).  There does not appear to be any existing support whatsoever for Dr. Schick's theory, and there is no suggestion that the theory has been tested or challenged by peer review or publication.  Both of these are considerations for the Court in making a reliability determination.  *See Daubert*, 509 U.S. at 593-94 (noting that in determining whether expert testimony should be presented to the jury, a court should consider whether the theory has been tested and whether the theory has been subjected to peer review and publication).  Moreover, based on the sources cited by Plaintiff in its Motion to Exclude[3], which were not rebutted by Defendant, it appears that Dr. Schick's opinions are unreliable.

Defendant does not specifically oppose any of the arguments Plaintiff made in support of its argument that this Court should exclude Dr. Schick's opinions under *Daubert*; rather, Defendant merely argues that Plaintiff's arguments go "to the weight of the evidence, not the admissibility of the evidence."  (Response, doc. #354, p.2).  This Court disagrees.  Defendant's argument fails to recognize "that Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'"  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (citing *Daubert*, 509 U.S. at 589).  This Court is obligated to engage in an initial review of the proposed expert testimony, and that is precisely what Plaintiff's Motion is requesting that this Court do.

---

[3]Plaintiff offered the following insightful explanation in its Motion to Exclude: "Indeed the literature suggests that Dr. Schick's distinction is incorrect; rather than describing hairs being cut by scratching or biting as frayed, Muller & Kirk's Small Animal Dermatology describes such cuts as being 'suddenly and cleanly broken.'  D. Scott et al., *Muller & Kirk's Small Animal Dermatology* 108 (6th ed. 2001), Exhibit 2; *see also* G. Muller, et al., *Animal Dermatology* 35 (3d ed. 1983) (describing hairs that are 'bitten off will have a straight or slightly angled break across the hair shaft of the remaining stubble.'), Exhibit 1."  (Motion, doc. #333, p.11).

Thus, the Court concludes that Dr. Schick's opinions as to whether any of the relevant tools cut pet hair are not sufficiently reliable. To the extent that Dr. Schick offers opinions on other topics, the Court need not reach these topics at this time.

## C.    LEGAL ANALYSIS

"Determination of patent infringement requires a two-step analysis: 1) the scope of the claims must be construed; and 2) the allegedly infringing device must be compared to the construed claims." *Mars, Inc. v. H.J. Heinz Co., L.P.*, 377 F.3d 1369, 1373 (Fed. Cir. 2004). The Court construed the claims of the '540 Patent in its Memorandum and Order dated November 9, 2009 [doc. #228]. Thus, to resolve the pending motions for summary judgment as to infringement, the Court must compare the Accused Tools to the construed claims of the '540 Patent. "To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995). "Application of the claim to the accused device is a question of fact." *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1345 (Fed. Cir. 2001).

Plaintiff argues that the Laube iVac tool infringes Claim 1 of the '540 Patent, and that the Laube Qwik-Change tool and the Laube Lazor Adjustable Blade Rake tool each infringe Claim 63 of the '540 Patent. The Court will compare each of these Accused Tools to the applicable claim in the sections that follow.

### 1.    Laube iVac Tool - Claim 1

As set forth above, Claim 1 of the '540 Patent requires:

1. For use with a furry pet such as a dog or cat having loose hair and non-loose hair, a pet grooming tool for removing the loose hair from the pet, the grooming tool comprising:

a handle portion, the handle portion having a recess;

a pet engageable portion secured to the handle portion, the pet engageable portion including a blade portion and a plurality of teeth, the blade portion comprising a leading surface and a trailing surface defining a blade edge, at least one of the teeth extending from the blade edge, the pet engageable portion being partially positioned within the recess of the handle portion;

the blade edge being adapted to engage the loose hair of the pet and pull it from the pet without cutting or pulling the non-loose hair from the pet as the pet engageable portion is moved in a first direction while the pet engageable portion is in engagement with the pet, the first direction being a direction in which the trailing surface trails the leading surface.

For ease of analysis, the Court will break the claim up into individual limitations, and determine whether the iVac tool possesses each of those limitations.

The first limitation is: "For use with a furry pet such as a dog or cat having loose hair and non-loose hair, a pet grooming tool for removing the loose hair from the pet." Several of the terms in this limitation were previously construed by this Court as follows:

1) "A furry pet" means "a pet having fur."

2) "Loose hair" means "hair that is inactive and not growing."

3) "Non-loose hair" means "hair that is active and growing."

4) "Removing the loose hair from the pet" requires no definition.

(Order on Claim Construction, doc. #228, p.39). It is undisputed that Defendant's advertisements for the Accused Tools, including the iVac tool, reveal that they are designed to be used with shedding breeds of dogs and cats to remove loose hair. Thus, the Court finds that the iVac tool possesses this first limitation.

The second limitation is: "a handle portion." The Court previously construed "handle portion" to mean, "portion of the grooming tool that the user holds and that secures the pet engageable portion." (Order on Claim Construction, doc. #228, p.39). It is undisputed that each of the Accused Tools, including the iVac tool, has a handle portion, which is a portion of the tool that the user holds. Thus, the Court finds that the iVac tool possesses this second limitation.

The third limitation contains a description of the handle portion discussed in the previous paragraph: "the handle portion having a recess." The Court previously construed "the handle portion having a recess" to mean "the handle portion having an indentation." (Order on Claim Construction, doc. #228, p.39). It is undisputed that the iVac tool is adapted to receive a metal pet engageable portion in a recess or indentation in the handle. Thus, the Court finds that the iVac tool possesses this third limitation.

The fourth limitation is: "a pet engageable portion secured to the handle portion." Two of the terms previously construed by this Court are relevant to this limitation:

1) "Pet engageable portion" means "portion of the grooming tool having a blade portion and more than one tooth."

2) "A pet engageable portion secured to the handle portion" means "a pet engageable portion fixed to the handle portion."

(Order on Claim Construction, doc. #228, p.39). It is undisputed that each of the Accused Tools, including the iVac tool, has a pet engageable portion, which is a metal portion that is used to engage the pet, that has more than one tooth. It is also undisputed that the pet engageable portion of the iVac tool is fixed to the handle portion of the tool by screws. Thus, the Court finds that the iVac tool possesses this fourth limitation.

The fifth limitation describes the pet engageable portion: "the pet engageable portion including a blade portion and a plurality of teeth, the blade portion comprising a leading surface and a trailing surface defining a blade edge." Several of the terms previously construed by this Court are relevant to this limitation:

1)     "Blade portion" means "portion of the pet engageable portion comprising a leading surface and a trailing surface defining a blade edge."

2)     "The blade portion comprising a leading surface and a trailing surface defining a blade edge" requires no definition.

3)     "Plurality of teeth" means "more than one tooth."

4)     "The pet engageable portion including a blade portion and a plurality of teeth" means "the pet engageable portion including a blade portion and more than one tooth."

5)     "Leading surface" means "surface of the blade portion that leads the trailing surface as the handle portion is pulled generally along the handle axis."

6)     "Trailing surface" means "surface of the blade portion that trails the leading surface as the handle portion is pulled generally along the handle axis."

7)     "Blade edge" means "the union of the leading and trailing surfaces."

(Order on Claim Construction, doc. #228, p.40). It is undisputed that each of the Accused Tools, including the iVac tool, has a pet engageable portion that has more than one tooth and a leading surface and a trailing surface that meet to form a blade edge. It is also undisputed that when a user pulls one of the Accused Tools in the direction the handle is pointing, the leading surface

leads the trailing surface of the blade portion.  Thus, the Court finds that the iVac tool possesses this fifth limitation.

The sixth limitation further describes the pet engageable portion, particularly the teeth aspect: "at least one of the teeth extending from the blade edge."  Again, several of the terms previously construed by this Court are relevant to this limitation:

1)    "Teeth extending from the blade edge" means "teeth projecting from the blade edge."

2)    "At least one of the teeth extending from the blade edge" means "one or more of the teeth projecting from the blade edge."

(Order on Claim Construction, doc. #228, p.40).  It is undisputed that for each of the Accused Tools, including the iVac tool, the teeth of the metal pet engageable portion project or extend from the blade edge.  Thus, the Court finds that the iVac tool possesses this sixth limitation.

The seventh limitation continues to describe the pet engageable portion, this time focusing on its position in the tool: "the pet engageable portion being partially positioned within the recess of the handle portion."  The Court previously construed "pet engageable portion being partially positioned within the recess of the handle portion" to mean "a portion of the pet engageable portion is located within the indentation of the handle portion."  (Order on Claim Construction, doc. #228, p.).  It is undisputed that when a pet engageable portion is placed in the recess of the iVac tool, such a pet engageable portion is partially positioned within the recess of the handle.  Thus, the Court finds that the iVac tool possesses this seventh limitation.

The final limitation appears in each of the apparatus claims in the '540 Patent, which include Claim 1 and Claim 63: "the blade edge being adapted to engage the loose hair of the pet

and pull it from the pet without cutting or pulling the non-loose hair from the pet as the pet engageable portion is moved in a first direction while the pet engageable portion is in engagement with the pet, the first direction being a direction in which the trailing surface trails the leading surface." Several of the claim terms previously construed by this Court are relevant to this limitation:

1) "Engage" requires no definition.

2) "The blade edge being adapted to engage the loose hair of the pet and pull it from the pet" requires no definition.

3) "Without cutting or pulling the non-loose hair" requires no definition.

4) "First direction" means "direction in which the trailing surface trails the leading surface."

5) "As the pet engageable portion is moved in a first direction" means "as the pet engageable portion is moved, the trailing surface trails the leading surface."

6) "In engagement with the pet" means "in contact with the pet."

7) "While the pet engageable portion is in engagement with the pet" means "while the pet engageable portion is in contact with the pet."

8) "The first direction being a direction in which the trailing surface trails the leading surface" means "as the pet engageable portion is moved, the trailing surface trails the leading surface."

(Order on Claim Construction, doc. #228, p.40-41). This limitation has two main components: the absence of cutting or pulling non-loose hair and the direction in which the pet engageable portion is moved. The latter is easily addressed because it is undisputed that to use any of the

24

Accused Tools, including the iVac tool, one pulls the tool in the direction that the handle is pointing. It is also undisputed that when pulled in the direction that the handle is pointing, the leading surface leads the trailing surface of the blade portion. Thus, the Court finds that the Accused Tools, including the iVac tool, possess the movement direction aspect of this limitation.

The absence of cutting or pulling non-loose hair component of this final limitation requires more analysis. It is undisputed that Plaintiff's veterinary dermatologist, Dr. Helen Globus, determined that the Accused Tools, including the iVac tool, do not cut or pull anagen (active or growing) hairs. The extensive testing procedure that Dr. Globus followed to reach these conclusions is set out in full in the Statement of Facts section above, and the Court need not recite it here a second time. The undisputed evidence thus supports the conclusion that the Accused Tools, including the iVac tool, do not cut or pull anagen hairs.

However, although Defendant did not dispute any of the facts set forth by Plaintiff regarding Dr. Globus's tests, Defendant does dedicate much of its Motion for Summary Judgment and its responsive briefs to arguing that Plaintiff is unable to prove that the Accused Tools remove loose hair without cutting or pulling non-loose hair. Although Defendant argues that Plaintiff has not offered any evidence that the Accused Tools remove loose hair without cutting *or pulling* non-loose hair, its argument focuses solely on the lack of evidence that the Accused Tools do not cut hair. Defendant first argued that Dr. Globus did not consider or make any conclusions as to whether any hair, loose or non-loose, had been cut. Then, presumably after Plaintiff pointed out that Dr. Globus did test for cutting and found that the Accused Tools did not cut hair, Defendant began criticizing Dr. Globus's cutting test because it was performed on human hair. These criticisms are not persuasive. Dr. Globus recognized that the pulling test

alone was not sufficient to determine whether the Accused Tools cut hair because cats and dogs normally have a number of broken or cut hairs.  Thus, Dr. Globus designed a test that would isolate the ability of the Accused Tools to cut or not cut anagen hairs.  In order to do so, Dr. Globus needed to use a subject that had primarily anagen hair, such as a human.  It is undisputed that Dr. Globus recognized that there are some differences between human hair and dog or cat hair, but she found these differences to be immaterial for the purpose of the cutting test. Defendant has repeatedly criticized Dr. Globus's cutting test for the sole reason that it was performed on humans instead of cats or dogs, but it has not cited to a single authority in support of its criticism.  Defendant's bald assertions that the tests are not reliable are insufficient to create a genuine issue of material fact in this case.  *See S. Brave Sys., Inc. v. Containment Techs. Corp.*, 96 F.3d 1372, 1376 (noting that "unsupported assertions of infringement" do not create a genuine issue of material fact).  Defendant also relies on the opinions of Dr. Robert O. Schick to support its argument that Plaintiff cannot establish that the Accused Tools do not cut anagen hair, but Dr. Schick's opinions have been excluded.  Thus, Dr. Globus's tests stand undisputed, and the Court finds them sufficient to establish that the Accused Tools remove loose telogen hair without cutting or pulling non-loose anagen hair.[4]

The Court finds that the Accused Tools, including the iVac tool, possess the second component of the final limitation, the absence of cutting or pulling non-loose hair.  Having

_____

[4]The Court notes that Defendant makes an extraneous argument regarding the inability of Plaintiff to establish that the Accused Tools were "*adapted* to engage the loose hair of the pet and pull it from the pet without cutting or pulling the non-loose hair from the pet."  Defendant's argument fails because the Court has already determined that the term need not be further construed.  Rather, it is sufficient that Plaintiff established that the Accused Tools were made in a way that allowed the tool to perform the ultimate function.

concluded that the iVac tool possesses each of the limitations of Claim 1 of the '540 Patent, the

Court finds that, unless Defendant is able to establish a valid defense, the iVac tool infringes

Plaintiff's '540 Patent.

### 2. Laube Qwik-Change Tool and Laube Lazor Adjustable Blade Rake Tool - Claim 63

As set forth above, Claim 63 of the '540 Patent requires:

For use with a furry pet such as a dog or cat having loose hair and non-loose hair, a pet grooming tool for removing the loose hair from the pet, the grooming tool comprising:
a handle portion;
a pet engageable portion secured to the handle portion, the pet engageable portion including a blade portion and a plurality of teeth, the blade portion comprising a leading surface and a trailing surface defining a blade edge, at least one of the teeth extending from the blade edge, the handle portion surrounding a portion of the pet engageable portion;
the blade edge being adapted to engage the loose hair of the pet and pull it from the pet without cutting or pulling the non-loose hair from the pet as the pet engageable portion is moved in a first direction while the pet engageable portion is in engagement with the pet, the first direction being a direction in which the trailing surface trails the leading surface.

Again, for ease of analysis, the Court will divide the claim into individual limitations, and

determine whether the Qwik-Change tool and the Lazor Blade tool possess each of those

limitations.[5]

The first limitation is: "For use with a furry pet such as a dog or cat having loose hair and

non-loose hair, a pet grooming tool for removing the loose hair from the pet." Several of the

terms in this limitation were previously construed by this Court as follows:

1) "A furry pet" means "a pet having fur."

_____

[5]The Qwik-Change tool and the Lazor Blade tool are addressed in the same section because both are alleged to infringe Claim 63 of the '540 Patent, and the necessary analysis is similar.

2)      "Loose hair" means "hair that is inactive and not growing."

3)      "Non-loose hair" means "hair that is active and growing."

4)      "Removing the loose hair from the pet" requires no definition.

(Order on Claim Construction, doc. #228, p.39).  It is undisputed that Defendant's advertisements for the Accused Tools, including the Qwik-Change tool and the Lazor Blade tool, reveal that they are designed to be used with shedding breeds of dogs and cats to remove loose hair.  Thus, the Court finds that the Qwik-Change tool and the Lazor Blade tool both possess this first limitation.

The second limitation is: "a handle portion."  The Court previously construed "handle portion" to mean, "portion of the grooming tool that the user holds and that secures the pet engageable portion."  (Order on Claim Construction, doc. #228, p.39).  It is undisputed that each of the Accused Tools, including the Qwik-Change tool and the Lazor Blade tool, has a handle portion, which is a portion of the tool that the user holds.  Thus, the Court finds that the Qwik-Change tool and the Lazor Blade tool both possess this second limitation.

The third limitation is: "a pet engageable portion secured to the handle portion."  Two of the terms previously construed by this Court are relevant to this limitation:

1)      "Pet engageable portion" means "portion of the grooming tool having a blade portion and more than one tooth."

2)      "A pet engageable portion secured to the handle portion" means  "a pet engageable portion fixed to the handle portion."

(Order on Claim Construction, doc. #228, p.39).  It is undisputed that each of the Accused Tools, including the Qwik-Change tool and the Lazor Blade tool, has a pet engageable portion, which is

a metal portion that is used to engage the pet, that has more than one tooth. It is also undisputed that the pet engageable portion on the Qwik-Change tool is secured within a portion of the handle portion, and the pet engageable portion on the Lazor Blade tool is fixed to the handle portion of the tool by screws. Thus, the Court finds that the Qwik-Change tool and the Lazor Blade tool both possess this third limitation.

The fourth limitation describes the pet engageable portion: "the pet engageable portion including a blade portion and a plurality of teeth, the blade portion comprising a leading surface and a trailing surface defining a blade edge." Several of the terms previously construed by this Court are relevant to this limitation:

1) "Blade portion" means "portion of the pet engageable portion comprising a leading surface and a trailing surface defining a blade edge."

2) "The blade portion comprising a leading surface and a trailing surface defining a blade edge" requires no definition.

3) "Plurality of teeth" means "more than one tooth."

4) "The pet engageable portion including a blade portion and a plurality of teeth" means "the pet engageable portion including a blade portion and more than one tooth."

5) "Leading surface" means "surface of the blade portion that leads the trailing surface as the handle portion is pulled generally along the handle axis."

6) "Trailing surface" means "surface of the blade portion that trails the leading surface as the handle portion is pulled generally along the handle axis."

7) "Blade edge" means "the union of the leading and trailing surfaces."

(Order on Claim Construction, doc. #228, p.40).  It is undisputed that each of the Accused Tools, including the Qwik-Change tool and the Lazor Blade tool, has a pet engageable portion that has more than one tooth and a leading surface and a trailing surface that meet to form a blade edge. It is also undisputed that when a user pulls one of the Accused Tools in the direction the handle is pointing, the leading surface leads the trailing surface of the blade portion.  Thus, the Court finds that the Qwik-Change tool and the Lazor Blade tool both possess this fourth limitation.

The fifth limitation further describes the pet engageable portion, particularly the teeth aspect: "at least one of the teeth extending from the blade edge."  Again, several of the terms previously construed by this Court are relevant to this limitation:

1)   "Teeth extending from the blade edge" means "teeth projecting from the blade edge."

2)   "At least one of the teeth extending from the blade edge" means "one or more of the teeth projecting from the blade edge."

(Order on Claim Construction, doc. #228, p.40).  It is undisputed that for each of the Accused Tools, including the Qwik-Change tool and the Lazor Blade tool, the teeth of the metal pet engageable portion project or extend from the blade edge.  Thus, the Court finds that the Qwik-Change tool and the Lazor Blade tool both possess this fifth limitation.

The sixth limitation continues to describe the pet engageable portion, this time focusing on its position in the tool with respect to the handle portion: "the handle portion surrounding a portion of the pet engageable portion."  The Court previously determined that the term "the handle portion surrounding a portion of the pet engageable portion" did not require any construction.  (Order on Claim Construction, doc. #228, p.44).  It is undisputed that, with respect

30

to both the Qwik-Change tool and the Lazor Blade tool, securing the metal pet engageable portion to the handle portion results in a portion of that metal pet engageable portion being surrounded by the handle portion. Thus, the Court finds that the Qwik-Change tool and the Lazor Blade tool both possess this sixth limitation.

The final limitation is the limitation that appears in each of the apparatus claims in the '540 Patent (which includes Claim 1 and Claim 63): "the blade edge being adapted to engage the loose hair of the pet and pull it from the pet without cutting or pulling the non-loose hair from the pet as the pet engageable portion is moved in a first direction while the pet engageable portion is in engagement with the pet, the first direction being a direction in which the trailing surface trails the leading surface." The analysis set forth in the preceding section regarding the absence of cutting or pulling non-loose hair and the direction in which the pet engageable portion is moved applies with equal force with respect to the Qwik-Change tool and the Lazor Blade tool. Thus, the Court concludes that the Qwik-Change tool and the Lazor Blade tool both possess the two components of the final limitation, and therefore, both possess each of the limitations of Claim 63 of the '540 Patent. Unless Defendant is able to establish a valid defense, the Qwik-Change tool and the Lazor Blade tool both infringe Plaintiff's '540 Patent.

### 3. Covenant Not to Sue

Defendant argues that the Court cannot find infringement because the Accused Tools are subject to a release and a covenant not to sue. However, the covenant not to sue relied upon by Defendant in support of this argument was specifically issued with respect to U.S. Patent No. 6,782,846 and U.S. Patent No. 7,077,076 only. This case involves a dispute regarding the '540 Patent, which was not included in the covenant not to sue. To the extent Defendant argues that

31

the '540 Patent should be included in the covenant not to sue, this argument has already been

rejected by United States District Judge Rodney W. Sippel in a related case.  *See FURminator,*

*Inc. v. Kim Laube & Co., Inc.*, 2009 WL 3305759, No. 4:06CV01314 RWS (E.D. Mo. Oct. 14,

2009).  Moreover, just because the '540 Patent is a continuation of the patents that were subject

to the covenant not to sue is of no importance.  "By statutory and common law, each patent

establishes an independent and distinct property right."  *Kearns v. General Motors Corp.*, 94

F.3d 1553, 1555 (Fed. Cir. 1996).  The '540 Patent is individual and distinct from the patents at

issue in the covenant not to sue, and the Court rejects Defendant's attempt to include the '540

Patent in the covenant not to sue.

Having found that the Accused Tools infringe the '540 Patent, the Court finds it

appropriate to enter summary judgment in favor of Plaintiff on the infringement claims.

## IV.    MOTION FOR SUMMARY JUDGMENT OF VALIDITY

Defendant has asserted invalidity arguments regarding the '540 Patent, under 35 U.S.C.

§§ 102 and 103.  Defendant has also asserted invalidity arguments under 35 U.S.C. § 112.

Plaintiff now seeks summary judgment on Defendant's invalidity claims, and thus filed

FURminator's Amended Motion for Summary Judgment of Validity Over Kim Laube & Co.,

Inc.'s Asserted References Under 35 U.S.C. §§ 102 and 103 and 35 U.S.C. § 112 [doc. #324].

Defendant's invalidity arguments are based on 120 alleged prior art references, set forth

in full in the Prior Art for Preliminary Invalidity Contentions supplement to Defendant's

Preliminary Invalidity Contentions [doc. #121-5].[6]  However, these 120 references have been

---

[6]The Court notes that Defendant initially identified 110 alleged prior art references, and
then identified an additional 10 after the deadline for identifying prior art references established
in this Court's Case Management Order.  However, the Court denied Plaintiff's motion to strike

excluded as a result of this Court's December 21, 2009 Order, which imposed the following sanctions on Defendant:

1) All testimony of Mr. Kim Laube, given as an expert or layperson, is stricken.

2) All documents and tools that Mr. Laube has relied on are excluded.

3) All other expert testimony that relies on Mr. Laube's testimony, documents, or tools is excluded.

4) Defendant is prevented from otherwise relying on any of the above listed materials in any way in this matter.

(Order, doc. #313, p.8). Mr. Kim Laube specifically stated in his Declaration dated July 2, 2009 that he "reviewed the Preliminary Invalidity Contentions of Munchkin and Laube in this matter" and that he "also reviewed the prior art cited therein." He then went on to state that, "I agree that the prior art references, either alone or in combination, contain each and every feature required in the claims of the '540 Patent . . . ." (Declaration, doc. #342-24, p.4 ¶17). Additionally, Mr. Laube attached to his Declaration a list of material reviewed, which included each of the 120 alleged prior art references. (Exhibit A to Declaration, doc. #121-4, p.13-18). It is clear that Mr. Laube reviewed and relied on all 120 of the alleged prior art references and they thus must be excluded under paragraph two of the Court's sanctions Order.

In its response to Plaintiff's Motion for Summary Judgment of Validity, Defendant argues that "it was wholely [sic] unnecessary to impose such draconian sanctions on them as a result of [Kim Laube & Company, Inc.]'s attorneys' conduct." (Response, doc. #359, p.6). Although the Court is not obligated to reiterate its basis for imposing sanctions against Mr. Laube, the Court

these additional 10 prior art references, concluding that Plaintiff did not demonstrate sufficient prejudice.

finds it necessary to do so in light of this misstatement by Defendant. In the December 21, 2009 Order [doc. #313], this Court found that Mr. Laube himself (not his attorneys) had acted in bad faith and committed a fraud on the Court. Specifically, the Court found that Mr. Laube had fabricated a fake pet grooming tool and falsely identified it as the "commercial embodiment" of U.S. Patent No. 5,339,840 ("the Koppel patent"), and as "prior art" to the '540 Patent. The Court also found that Mr. Laube then engaged in a series of actions designed to deceive Plaintiff and this Court into believing that the fake pet grooming tool was actually in existence before the effective day of the '540 Patent. Moreover, Mr. Laube's fabrication of a fake pet grooming tool was merely the latest in a pattern and practice of misrepresentations and misconduct in this case. As noted previously by this Court, there is evidence that Mr. Laube fabricated or modified at least one other pet grooming tool, and that he gave conflicting testimony in another court regarding whether he had design documents to support his assertion that he had been designing tools similar to the FURminator DeShedding Tools since 1975. Upon considering the misconduct of Mr. Laube in this case and the possible sanctions it could issue, the Court determined that it was appropriate to strike Mr. Laube's testimony and related evidence. While Defendant clearly disagrees with this conclusion, the Court believes that the sanction was appropriate, considering the seriousness of the fraudulent actions.

Turning back to Plaintiff's Motion for Summary Judgment of Validity, "'[b]ecause a patent is presumed to be valid, the evidentiary burden to show facts supporting a conclusion of invalidity is one of clear and convincing evidence.'" *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1331 (Fed. Cir. 2010) (quoting *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1345 (Fed. Cir. 2010)). Without the 120 alleged prior art references, Defendant is left with no evidence to

challenge the validity of the '540 Patent, and the presumption of validity remains intact. Thus, it is appropriate to enter summary judgment in favor of Plaintiff, finding that no claim of the '540 Patent is invalid.

## V. MOTION FOR SUMMARY JUDGMENT ON COUNTS V-X OF KIM LAUBE & CO., INC.'S COMPLAINT

Next, Plaintiff requests that the Court enter summary judgment in its favor on the following claims made by Defendant in its Amended Complaint[7]: injurious falsehood and product disparagement (count V); tortious interference with economic relations (count VI); tortious interference with prospective economic advantage (count VII); defamation per se (count VIII); common law unfair competition (count IX); and unfair competition under the Lanham Act (count X). Each of these tort claims is based on Defendant's argument that Plaintiff improperly told Defendant's customers that the '540 Patent is valid, and that Defendant's products infringed it.

### A. STATEMENT OF FACTS[8]

[7]As set forth above, Defendant Kim Laube & Co., Inc was originally a plaintiff in this case, which explains why a defendant has a complaint on file. Subsequently, by agreement of the parties, the case was consolidated with another case, and the parties were realigned.

[8]Because Defendant did not file a substantive response or memorandum in opposition to FURminator's Amended Motion for Summary Judgment on Counts V through X of Kim Laube & Co., Inc.'s Complaint [doc. #326], each of the facts listed in FURminator's Statement of Uncontroverted Material Facts Concerning its Amended Motion for Summary Judgment on Counts V through X of Laube's Complaint [doc. #327-1] will be deemed admitted. *See* Local Rule 7-4.01(E) ("Every memorandum in opposition shall include a statement of material facts as to which the party contends a genuine issue exists. Those matters in dispute shall be set forth with specific references to portions of the record, where available, upon which the opposing party relies. The opposing party also shall note for all disputed facts the paragraph number from movant's listing of facts. All matters set forth in the statement of the movant shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party."). Thus, the Court's recitation of the facts in this case is taken exclusively from Plaintiff's

Plaintiff owns U.S. Patent No. 7,334,540 ("the '540 Patent"). Defendant sells the Laube Qwik-Change Deshedding Tool, the Laube iVac tool, and the Laube Lazor Adjustable Blade Rake tool (collectively, "Accused Tools"). Plaintiff sued Defendant for patent infringement of the '540 Patent on February 26, 2008. On March 17, 2008, Defendant sued Plaintiff in the United States District Court for the Eastern District of Missouri. Defendant asserted, *inter alia*, the following claims against Plaintiff: injurious falsehood and product disparagement, tortious interference with economic relations, tortious interference with prospective economic advantage, defamation per se, common law unfair competition, and unfair competition under the Lanham Act. On November 13, 2008, Defendant reasserted each of these claims against Plaintiff in an Amended Complaint [doc. #51].

Defendant alleges that Plaintiff made public statements to the industry regarding Defendant's alleged infringement with knowledge that the '540 Patent is invalid. Defendant also alleges that Plaintiff made public statements to the industry asserting that the '540 Patent is valid, with knowledge that the patent is invalid. Defendant claims that Plaintiff made the statements "with knowledge that the ['540 Patent is] invalid;" with knowledge that the '540 Patent was "obtained through fraud;" and "with knowledge that Defendants do not infringe any valid claim" of the '540 Patent. Plaintiff received the '540 Patent from the United States Patent and Trademark Office. No court has found the '540 Patent invalid.

statement of facts. The Court will also consider the various exhibits cited by Plaintiff, where appropriate.

## B.     LEGAL ANALYSIS

The tort claims for which Plaintiff has moved for summary judgment have a common

thread: each claim involves an allegation that Plaintiff knowingly made false statements to third

parties regarding the validity of the '540 Patent, and the infringement of that patent by the

Accused Tools.[9]  Such statements by a patent holder are protected to a certain extent under

_____

[9]In Count V, for injurious falsehood and product disparagement, Defendant alleges:
"Written and verbal representations impliedly or expressly stating that [Defendant] infringe[s]
[Plaintiff's] valid and enforceable patent rights were made to [Defendant's] customers and
potential customers despite [Plaintiff's] knowledge that these statements were false."
(Amended Complaint, doc. #51, p.16 ¶83).  In Count VI, for tortious interference with economic
relations, Defendant alleges:  "In making the false and misleading representations detailed herein
relating to the allegedly infringing nature of [Defendant's] products and the validity and
enforceability of [Plaintiff's] patent rights, [Plaintiff] intentionally interfered with [Defendant's]
economic relationships and/or potential contractual relationships with customers and others.
[Plaintiff] had no reasonable basis in law or fact for their false statements."  (Amended
Complaint, doc. #51, p.17-18 ¶91).  In Count VII, for tortious interference with prospective
economic advantage, Defendant alleges:  "[Plaintiff is] aware of these relationships and [is]
interfering with them with the malicious intent to injure through the use of wrongful means
including fraudulent and misleading representations pertaining to the patented nature of [its]
products and the alleged infringing nature of [Defendant's] products. [Plaintiff] had no
reasonable basis in law or fact for these false statements since [Plaintiff] knew [it] had no valid
or enforceable patent rights."  (Amended Complaint, doc. #51, p.18-19 ¶97).  In Count VIII, for
defamation per se, Defendant alleges:  "In its written and verbal communications with various
customers and potential customers of [Defendant], [Plaintiff] state[s] that [Defendant] infringe[s]
valid and enforceable patent rights owned by [Plaintiff].  These purported factual statements were
false at the time they were made and continue to be false.  Said statements were transmitted by
[Plaintiff] to third parties either verbally or in writing with the malicious intent to injury
[Defendant's] business, without justification or excuse, without any reasonable basis in law or
fact, and with knowledge of their falsity."  (Amended Complaint, doc. #51, p.19 ¶101-102).  In
Count IX, for common law unfair competition, Defendant alleges:  "[Plaintiff] made false and
misleading representations to customers, potential customers and those with whom [Defendant]
had existing economic relations that products developed, manufactured and sold by [Defendant]
infringe valid and enforceable patent rights [owned by Plaintiff]. [Plaintiff] made these
statements of infringement without a reasonable belief that [Defendant's] products could possibly
infringe any valid or enforceable patent issued to [Plaintiff]."  (Amended Complaint, doc. #51,
p.20 ¶106-107).  Finally, in Count X, for unfair competition under the Lanham Act, Defendant
alleges: "[Plaintiff] made false and misleading representations to [Defendant's] customers and
potential customers in order to promote its products and to disparage [Defendant's] products, *i.e.*,

37

federal patent law. The Federal Circuit has "on several occasions recognized that a patentee's statements regarding its patent rights are conditionally privileged under the patent laws, so that such statements are not actionable unless made in bad faith." *Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1353 (Fed. Cir. 1999). "[F]ederal patent law preempts state-law tort liability for a patentholder's good faith conduct in communications asserting infringement of its patent and warning about potential litigation." *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 362 F.3d 1367, 1374 (Fed. Cir. 2004). In order to avoid preemption of state-law tort liability, "'bad faith must be alleged and ultimately proven, even if bad faith is not otherwise an element of the tort claim.'" *Id.* (quoting *Zenith Elecs.*, 182 F.3d at 1355). Additionally, "[t]o prevail on an unfair competition claim under section 43(a) of the Lanham Act stemming from a patentee's marketplace activity in support of his patent, the claimant must first establish that the activity was undertaken in bad faith." *Judkins v. HT Window Fashion Corp.*, 529 F.3d 1334, 1338 (Fed. Cir. 2008). Thus, "[t]o survive summary judgment, [Defendant] must present affirmative evidence sufficient for a reasonable jury to conclude that [Plaintiff] acted in bad faith, in light of the burden of clear and convincing evidence that will adhere at trial." *Golan v. Pingel Enter., Inc.*, 310 F.3d 1360, 1371 (Fed. Cir. 2002).

There is an objective component and a subjective component to the bad faith standard. *See 800 Adept, Inc. v. Murex Sec., Ltd.*, 539 F.3d 1354, 1370 (Fed. Cir. 2008). "The objective component requires a showing that the infringement allegations are 'objectively baseless.'" *Id.*

---

that products developed, manufactured and sold by [Defendant] infringe valid and enforceable patents [owned by Plaintiff]. . . . [Plaintiff's] false and misleading statements were undertaken in bad faith in that they were made with knowledge of the invalidity and/or unenforceability of the '540 Patent and with knowledge that [Defendant's] accused products do not infringe any valid or enforceable claim of the '540 Patent." (Amended Complaint, doc. #51, p.21-22 ¶113, 118).

(quoting *Globetrotter Software*, 362 F.3d at 1375). "Infringement allegations are objectively baseless if 'no reasonable litigant could realistically expect success on the merits.'" *Id.* (quoting *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993)). "The subjective component relates to a showing that the patentee in enforcing the patent demonstrated subjective bad faith. Absent a showing that the infringement allegations are objectively baseless, it is unnecessary to reach the question of the patentee's intent." *800 Adept*, 539 F.3d at 1370 (internal citation omitted).

To establish objective bad faith in this case, Defendant must establish that Plaintiff either knew or should have known that the '540 Patent is invalid or that the Accused Tools do not infringe the '540 Patent. *See Golan*, 310 F.3d at 1371. However, Defendant has not set forth any evidence, other than Mr. Laube's bald accusations, that would even suggest that Plaintiff knew that the '540 Patent was invalid when the statements were made. The same is true with respect to the claim that Plaintiff knew that the Accused Tools did not infringe the '540 Patent when the statements were made. It is not sufficient to merely reiterate the accusations set forth in the initial pleadings; rather, at this stage in the proceedings, Defendant is required to set forth some affirmative evidence in support of its allegations. *See Erbe Elektromedizin GmbH v. Canady Tech. LLC*, 2010 WL 5050544, at *8 (Fed. Cir. Dec. 9, 2010) ("Federal Rule of Civil Procedure 56(c) requires the nonmoving part to adduce more than a mere scintilla of evidence in its favor, and that party cannot simply reassert factually unsupported allegations contained in its pleadings." (internal citations omitted)). Defendant has completely failed to do so. Moreover, even if such bald accusations were sufficient, Mr. Laube's testimony has been stricken as a result of this Court's December 21, 2009 Order, which imposed sanctions on Defendant. Defendant

has failed to set forth affirmative evidence sufficient for a reasonable jury to conclude that

Plaintiff acted in bad faith,[10] thus it is appropriate to grant summary judgment in favor of Plaintiff

on Defendant's tort claims:  injurious falsehood and product disparagement (count V); tortious

interference with economic relations (count VI); tortious interference with prospective economic

advantage (count VII); defamation per se (count VIII); common law unfair competition (count

IX); and unfair competition under the Lanham Act (count X).

## VI.    MOTION FOR SUMMARY JUDGMENT ON INEQUITABLE CONDUCT

In the final Motion for Summary Judgment pending before this Court, Plaintiff requests

that the Court enter summary judgment in favor of Plaintiff and against Defendant on Count IV

of Defendant's Complaint, which alleges inequitable conduct.  Defendant specifies five particular

ways in which it alleges that Plaintiff committed inequitable conduct: 1) failing to provide prior

art patents to the U.S. Patent and Trademark Office ("PTO") during the prosecution of the '846

Patent; 2) intentionally withholding information about stripping knives and their uses during the

prosecution of the '846 Patent; 3) failing to inform the PTO during the prosecution of the '846

Patent that one of the inventors attended a trade show seminar where attendees were supposedly

taught to combine electric trimmer blades and handles; 4) failing to provide the PTO with written

summaries of submitted references during the prosecution of U.S. Patent No, 7,077,076 ("the

'076 Patent") and the '540 Patent; and 5) failing to provide the PTO with written summaries of

litigation documents during the prosecution of the '076 Patent and the '540 Patent.

---

[10]Defendant's failure to file a response to this Motion for Summary Judgment suggests
that Defendant concedes its lack of evidence to support its tort claims.

## A.    STATEMENT OF FACTS[11]

Before the Court begins its recitation of the facts relevant to this motion for summary

judgment as to inequitable conduct, the Court must reiterate that Federal Rule of Civil Procedure

56(c) requires that

> [a] party asserting that a fact cannot be or is genuinely disputed must support the
> assertion by:
>
> (A) citing to particular parts of materials in the record . . . or
>
> (B) showing that the materials cited do not establish the absence or presence of a
> genuine dispute, or that an adverse party cannot produce admissible evidence to
> support the fact.

Additionally, the Local Rules of this Court provide:

> A memorandum in support of a motion for summary judgment shall have attached
> a statement of uncontroverted material facts, set forth in a separately numbered
> paragraph for each fact, indicating whether each fact is established by the record, and,
> if so, the appropriate citations.  Every memorandum in opposition shall include a
> statement of material facts as to which the party contends a genuine issue exists.
> Those matters in dispute shall be set forth with specific references to portions of the
> record, where available, upon which the opposing party relies.  The opposing party
> also shall note for all disputed facts the paragraph number from movant's listing of
> facts.  All matters set forth in the statement of the movant shall be deemed admitted
> for purposes of summary judgment unless specifically controverted by the opposing
> party.

Local Rule 7-4.01(E).  Local rules such as this are implemented in order to prevent district courts

from having to "scour the record looking for factual disputes."  *Nw. Bank & Trust Co. v. First Ill.*

*Nat'l Bank*, 354 F.3d 721, 725 (8th Cir. 2003).

---

[11]The Court's recitation of the facts is taken from FURminator's Statement of
Uncontroverted Material Facts in Support of its Motion for Summary Judgment on Count IV of
Kim Laube & Co., Inc.'s Complaint Alleging Inequitable Conduct [doc. #329-1].  The Court also
considered the exhibits submitted by the Parties, where appropriate.

The Court notes that the facts contained in this section apply only to the Court's analysis
of Plaintiff's motion for summary judgment as to inequitable conduct.

Defendant filed a response to Plaintiff's Motion for Summary Judgment, but it does not include a statement of material facts as to which Defendant contends a genuine issue exists at all, nor one that properly conforms to the requirements of the Local Rules and the Federal Rules of Civil Procedure. Defendant does not controvert any of the facts set forth by Plaintiff, so, pursuant to the local rules of this Court, the Court will deem admitted each fact contained within FURminator's Statement of Uncontroverted Material Facts in Support of its Motion for Summary Judgment on Count IV of Kim Laube & Co., Inc.'s Complaint Alleging Inequitable Conduct [doc. #329-1]. This determination is made only for the purpose of the Court's consideration of Plaintiff's Motion for Summary Judgment on Count IV of Kim Laube & Co., Inc.'s Complaint Alleging Inequitable Conduct [doc. #328].

### 1. Porter Patent Search

Turning now to the facts relevant to this motion for summary judgment, in 1999, David Porter conducted an internet search on the PTO's website. The internet search sought records in the PTO's 1976-1999 database by searching for the words "dog" and "grooming." In response to this search, the PTO's website generated a list of 147 patent numbers and their corresponding titles. Defendant has no evidence that Mr. Porter's internet search produced any information about the subject matter of the patents found on the search, other than the patent number and corresponding title. Defendant has no evidence that Mr. Porter, at the time he conducted his search of the PTO's website, could access via the internet images of the patents found on his internet search. Defendant has no evidence that Mr. Porter ever viewed images of any design patents listed on his internet search, or that he ever obtained copies of the patents listed on his

internet search. Defendant also has no evidence that Mr. Porter ever read or examined any patent listed on his internet search.

After printing out the results of his internet search, Mr. Porter decided that he had no idea what he was doing and went out and sought legal counsel. He contacted Alan Norman to serve as his patent counsel. Defendant has no evidence that Mr. Porter ever showed his internet search to Alan Norman, or that Mr. Norman ever saw Mr. Porter's internet search prior to litigation involving the '846 Patent in 2006. Defendant also has no evidence that Angela Porter ever saw or knew of Mr. Porter's internet search of the PTO website.

Defendant has no evidence of Mr. Porter or Mr. Norman having knowledge of any prior art patent that was not subsequently produced to the PTO. Defendant has no evidence that Mr. Porter conducted any searches other than the initial search of the PTO website during the prosecution of the application which resulted in the '846 Patent. Defendant also has no evidence that any attorneys other than Mr. Norman were involved in the prosecution of the '846 Patent. Defendant has not determined who, amongst those involved in the prosecution, allegedly withheld the prior art patents from the PTO.

Edward Renner testified that the prior art patents Plaintiff allegedly withheld from the PTO were material because they had brushes that were meant to be in contact with the coat of an animal and handles that were meant to be held by the hand so as to relieve stress on the hand. Mr. Renner admitted that references before the Examiner during the prosecution of the '846 Patent, other than those allegedly withheld from the PTO, had handles that were meant to be held and grasped. Mr. Renner also admitted that references before the Examiner during the prosecution of the '846 Patent, other than those allegedly withheld from the PTO, had brushes.

Defendant has no evidence of any prior art patents that were allegedly withheld from the PTO that possessed any characteristic that was not found in the other references before the Examiner during the prosecution of the '846 Patent.

Defendant has no evidence sufficient to infer Mr. Porter's, Ms. Porter's, or Mr. Norman's intent to deceive the PTO through the alleged withholding of prior art patents. Defendant has merely inferred that those involved in the prosecution of the patent application which resulted in the '846 Patent intended to deceive the PTO by allegedly withholding prior art patents. Defendant's only support for this inference is that those prior art patents were not supplied to the PTO.

### 2. Knowledge of Stripping Knives Use

Stripping is a technique for "pulling the hair [of a pet] by the root." (Pearson Products Website, Pl.'s Ex. 54, doc. #342-41, p.3). Defendant has no evidence that Mr. Porter or Mr. Norman had any knowledge of stripping knives or their use during the prosecution of the application which resulted in the '846 Patent. With the exception of Ms. Porter, Defendant has no evidence that anyone else involved in the prosecution of the '846 Patent had any knowledge of stripping knives and their use. Defendant has no evidence that Ms. Porter knew that stripping knives could be used to do anything but pluck or cut hair from a pet's coat. Defendant also has no evidence indicating that Mr. Porter or Ms. Porter, during the prosecution of the '846 Patent, knew that stripping knives could be used for "carding."[12]

---

[12]"Carding" is a technique used to remove loose hair. Defendant quoted Angela Porter as having stated that "carding" consists of "taking a 40 blade in your hand and taking it across the dog's coat." (Response, doc. #359, p.20).

Defendant has not determined who, amongst those involved in the prosecution of the patent application which resulted in the '846 Patent, allegedly withheld from the PTO that stripping knives could be used for a purpose other than plucking and cutting pet hair. Defendant has no evidence sufficient to infer that Mr. Porter, Ms. Porter, or Mr. Norman intended to deceive the PTO by allegedly not informing the PTO that stripping knives could be used for a purpose other than pulling or cutting pet hair. Defendant has merely inferred that those involved in the prosecution of the '846 Patent intended to deceive the PTO. Defendant has no evidence to support this inference that, other than the fact that Plaintiff did not disclose that stripping knives could be used for a purpose other than plucking or cutting pet hair.

### 3.    Trade Show Seminar Attendance

Angela Porter attended pet grooming trade shows, and attended seminars given at those trade shows. Ms. Porter testified in her deposition that she attended trade shows held by Pam Lauritzen, but she did not recall attending any seminars taught by Ms. Lauritzen. Ms. Lauritzen testified in her deposition that she has no specific recollection of Ms. Porter attending any trade show seminars that she taught. Defendant has no evidence indicating that Ms. Porter attended seminars conducted by Ms. Lauritzen at pet grooming trade shows.

Ms. Lauritzen has no documentary evidence corroborating her testimony that she taught seminar attendees that the combination of a #40 blade and a handle would make attendees a million dollars. Neither does Defendant have corroboration for this testimony. Ms. Lauritzen has never documented anywhere that she suggested to anyone that combining any portion of an electric trimmer with a handle is a good idea. Defendant has no evidence that Mr. Porter, Mr. Norman, or anyone else associated with the prosecution of the application which resulted in the

'846 Patent ever knew that Ms. Porter allegedly attended a trade show seminar conducted by Ms. Lauritzen, at which Ms. Lauritzen told attendees that combining a #40 blade and a handle would make attendees a million dollars.

Defendant has not determined who, amongst those involved in the prosecution of the '846 Patent, withheld from the PTO that Ms. Porter allegedly attended a trade show seminar hosted by Ms. Lauritzen. Defendant has no evidence sufficient to infer Mr. Porter's, Ms. Porter's, or Mr. Norman's intent to deceive the PTO by withholding information regarding Ms. Porter's alleged attendance at a trade show seminar hosted by Ms. Lauritzen. Defendant has merely inferred that those involved in the prosecution of the '846 Patent intended to deceive the PTO by withholding information regarding Ms. Porter's alleged attendance at a trade show seminar taught by Ms. Lauritzen. Defendant's sole support for this inference is Plaintiff's alleged failure to inform the PTO of Ms. Porter's attendance at the seminar.

### 4. Alleged Failure to Highlight Most Material References

Since May 30, 2000, Plaintiff has, at all times up until February 26, 2008, had at least one pending patent application related to the technology described in the '540 Patent. In connection with patent litigation involving one or more of the FURminator patents, accused infringers have provided Plaintiff with various references alleged to invalidate or render obvious the claims of the FURminator patents. The duty of candor required all those associated with the filing and prosecution of Plaintiff's patent applications to disclose to the PTO all information known to those individuals to be material to patentability. Defendant has no evidence that Plaintiff has withheld from the PTO copies of any references provided by alleged infringers, and which allegedly invalidate or render obvious the claims of the FURminator patents. The duty to

disclose all information known to be material to patentability is deemed to be satisfied if all information known to be material to patentability of any claim was cited by the PTO or submitted to the PTO in the manner prescribed by 37 C.F.R. §§ 1.97(b)-(d) and 1.98.

Defendant also has no evidence that Plaintiff failed to identify any of the references cited by accused infringers against the FURminator patents in litigation on Information Disclosure Statements that were submitted to the PTO. Examiners at the PTO are required to consider every reference submitted in compliance with 37 C.F.R. §§ 1.97 and 1.98. Defendant has no evidence that the examiner responsible for handling the prosecution of each of the FURminator patents objected to any of the Information Disclosure Statements submitted by Plaintiff for failure to comply with 37 C.F.R. §§ 1.97 or 1.98. The examiner responsible for handling the prosecution of each of the FURminator patent applications indicated that she considered each of the references submitted by Plaintiff on Information Disclosure Statements, and Defendant has no evidence suggesting otherwise.

Defendant has no evidence that any statute or any rule found in Title 37 of the Code of Federal Regulations requires patent applicants to provide written summaries of the documents known to be most material when submitting lists of documents to the PTO during patent prosecution. Defendant relies on the Manual of Patent Examining Procedure ("MPEP") § 2004, subparagraph 13, to support its claim that Plaintiff was required to provide a written summary of the documents known to be most material when submitting lists of documents to the PTO during patent prosecution. MPEP § 2004 is entitled "Aids to Compliance with Duty of Disclosure," and begins with a paragraph which states that the items listed in the section "are offered as examples of possible procedures which could help avoid problems with the duty of disclosure." MPEP §

2004 also states that the procedures listed "may not be required," and that they are being presented "as helpful suggestions for avoiding duty of disclosure problems."

Defendant also relies on *Penn Yann Boats, Inc. v. Sea Lark Boats, Inc.*, 359 F. Supp. 948 (S.D. Fla. 1972), *aff'd*, 479 F.2d 1328 (5th Cir. 1973), to support its claim that Plaintiff was required to provide a written summary of the documents known to be most material when submitting lists of documents to the PTO during patent prosecution. The *Penn Yann* case, which was cited in MPEP § 2004, was decided prior to the change in PTO rules that occurred in 1992, which removed the obligation to submit "[a] concise explanation of the relevance of each listed item" submitted on an Information Disclosure Statement. *Compare* 37 C.F.R. § 1.98 (1989), *with* 37 C.F.R. § 1.98 (2007). Defendant's expert, Mr. Renner, admitted that the PTO has considered changes to the current rules designed to limit the ability of patent applicants to submit voluminous collections of references without written summaries of the most significant of those references.

Defendant has no evidence that Plaintiff ever examined whether any of the references submitted during the prosecution of the FURminator patents were more material than others. Defendant has no evidence that anyone associated with the prosecution of the FURminator patents ever knew that certain references were more material than other references submitted to the PTO. Defendant has not determined who, amongst those involved in the prosecution of the patent application which resulted in the '846 Patent, actually withheld from the PTO the written summary of the most material references submitted by Plaintiff. Defendant has no direct evidence of Mr. Porter's, Ms. Porter's, Mr. Norman's, or Clyde Smith's intent to deceive the PTO by withholding the written summary of the most material references submitted by Plaintiff.

Defendant has merely inferred that those involved in the prosecution of the FURminator patents intended to deceive the PTO by withholding said written summary. Defendant's only support for this inference is Plaintiff's alleged failure to provide written summaries of the references and the lack of an explanation for that alleged omission.

### 5. Alleged Failure to Provide Written Summary of Litigation Issues

Edward Renner initially alleged that Plaintiff committed inequitable conduct by not providing certain litigation documents (pleadings, motions, rulings, etc.) to the PTO during the patent application process. However, Mr. Renner admitted during his deposition that all of the arguments raised by the various patent litigation defendants, as well as all of the evidence supporting those arguments, had been supported to the PTO. Mr. Renner then alleged that Plaintiff had instead committed inequitable conduct by not providing to the PTO a written summary of "what issues in the litigation were and how the documents that were being supplied to the patent office relate to those issues."

As of December 2009, Plaintiff had been involved in eight cases of federal litigation involving its FURminator patents, and eight notices had been sent from federal district courts to the PTO, providing notice of the ongoing litigation involving the FURminator patents. Pursuant to its duty of candor, Plaintiff provided to the PTO a number of different litigation documents, including pleadings, motions, and declarations, from the various FURminator patent litigations. Plaintiff identified all of the litigation documents it submitted to the PTO on Information Disclosure Statements.

Defendant has no evidence that anyone associated with the prosecution of the FURminator patents, including Mr. Porter, Ms. Porter, Mr. Norman, and Mr. Smith, conducted

an analysis to determine all of the litigation issues raised during litigation involving the FURminator patents. Defendant is aware of no statute, caselaw, or provision in Title 37 of the Code of Federal Regulations that references providing a written summary of all of the issues involved in ongoing litigation to the PTO during patent prosecution. Defendant relies on the MPEP § 2001.06(c) to support its claims that Plaintiff was required to provide a written summary of the issues in ongoing patent litigation. MPEP § 2001.06(c) requires patent applicants to bring to the PTO's attention the existence of any litigation involving the subject matter for which a patent is being sought, as well as any other material information. Material information is defined to include "evidence of possible prior public use or sales, questions of inventorship, prior art, allegations of 'fraud,' 'inequitable conduct,' and violation of 'duty of disclosure.'"

Defendant has no evidence of any litigation issue (including evidence or prior art and allegations of inequitable conduct) raised during litigation involving the FURminator patents that was not subsequently provided to the PTO by Plaintiff. Defendant also has no evidence that Plaintiff failed to provide to the PTO evidence relied upon by any party in ongoing litigation regarding any litigation issue involving FURminator patents. Defendant has not determined who, amongst those involved in the prosecution of the patent applications which resulted in the FURminator patents, actually withheld from the PTO the written summary of litigation issues from FURminator patent litigation. Defendant has no evidence sufficient to infer Mr. Porter's, Ms. Porter's, Mr. Norman's, or Mr. Smith's intent to deceive the PTO by withholding the written summary of litigation issues from FURminator patent litigation. Other than the omission of the written summary of litigation issues and a lack of an explanation for that omission, Defendant

has no evidence that anyone involved in the prosecution of the FURminator patents intended to deceive the PTO.

## B. LEGAL ANALYSIS

"Patent applicants 'have a duty to prosecute patent applications in the [PTO] with candor, good faith, and honesty.'" *Advanced Magnetic Closures, Inc. v. Rome Fastener Corp.*, 607 F.3d 817, 829 (Fed. Cir. 2010) (alteration in original) (quoting *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 999 (Fed. Cir. 2007)). "Inequitable conduct occurs when a patentee breaches his or her duty to the PTO of candor, good faith, and honesty." *Warner-Lambert Co. v. Teva Pharm. USA, Inc.*, 418 F.3d 1326, 1342 (Fed. Cir. 2005) (internal quotations omitted).

As set forth above, Defendant specified five particular ways in which it alleges that Plaintiff committed inequitable conduct: 1) failing to provide prior art patents to the PTO during the prosecution of the '846 Patent; 2) intentionally withholding information about stripping knives and their uses during the prosecution of the '846 Patent; 3) failing to inform the PTO during the prosecution of the '846 Patent that one of the inventors attended a trade show seminar where attendees were supposedly taught to combine electric trimmer blades and handles; 4) failing to provide the PTO with written summaries of the most material submitted references during the prosecution of the '076 Patent and the '540 Patent; and 5) failing to provide the PTO with written summaries of litigation documents during the prosecution of the '076 Patent and the '540 Patent. Each of these allegations involves an allegation of failure to disclose material information to the PTO. The Federal Circuit has established the following standard to apply with respect to such allegations:

Inequitable conduct due to failure to disclose material information must be proven by clear and convincing evidence of: (1) prior art that was material; (2) knowledge chargeable to an applicant of that prior art and of its materiality; and (3) failure of the applicant to disclose the art resulting from an intent to mislead the PTO. Such proof of inequitable conduct may be rebutted by a showing that: (a) the prior art was not material; (b) if the prior art was material, a showing that the applicant did not know of that art; (c) if the applicant did know of that art, a showing that the applicant did not know if its materiality; or (d) a showing that the applicant's failure to disclose the art did not result from an intent to mislead the PTO.

*Elk Corp. of Dallas v. GAF Bldg. Materials Corp.*, 168 F.3d 28, 30 (Fed. Cir. 1999) (internal citations omitted). The Court will address each of Defendant's five allegations of inequitable conduct, in turn.

### 1. Failure to Provide Prior Art Patents

Defendant first alleges that Plaintiff engaged in inequitable conduct by failing to disclose certain prior art patents that Mr. Porter discovered in an internet search of the PTO's patent database during the prosecution of the '846 Patent. This claim fails, as Defendant is unable to prove materiality, knowledge, and deceptive intent.

First, as to materiality, it is undisputed that Defendant has no evidence of any prior art patents that were allegedly withheld from the PTO that possessed any characteristic that was not found in the other references before the Examiner during the prosecution of the '846 Patent. As a result, these allegedly withheld prior art patents were merely cumulative of the references that Plaintiff submitted to the Examiner. The Federal Circuit has clearly established that "'a withheld otherwise material reference is not material if it is merely cumulative to, or less relevant than, information already considered by the examiner.'" *Leviton Mfg. Co., Inc. v. Universal Sec. Instruments, Inc.*, 606 F.3d 1353, 1359 (Fed. Cir. 2010) (quoting *Larson Mfg. Co. v. Aluminart Prods. Ltd.*, 559 F.3d 1317, 1327 (Fed. Cir. 2009)). Thus, even if the prior art patents that were

allegedly withheld from the PTO were otherwise material, Defendant cannot establish materiality because the prior art patents at issue were cumulative.

Even assuming that the prior art patents that were allegedly withheld from the PTO were in fact material, Defendant's inequitable conduct claim still fails because it cannot establish that Plaintiff knew of the prior art and its materiality. It is undisputed that Defendant does not have any evidence to establish that Plaintiff knew about the withheld prior art patents at the time of the prosecution of the '846 Patent. It is not sufficient to point to Mr. Porter's internet search to demonstrate that Plaintiff knew about the prior art patents at issue. No one involved in the prosecution of the '846 Patent knew about Mr. Porter's internet search at the time of the prosecution, with the exception of Mr. Porter himself, and there is no evidence that Mr. Porter actually examined any of the patents that were listed in the results of the internet search. Thus, Defendant cannot establish that someone involved in the prosecution of the '846 Patent actually was aware of the existence of these additional prior art patents.

Additionally, Defendant's inequitable conduct claim also fails because it cannot establish that Plaintiff intended to deceive the PTO. The only "proof" Defendant offers of intent to deceive is that the prior art patents were not supplied to the PTO. As established by the Federal Circuit, "[i]ntent to deceive cannot be inferred simply from the decision to withhold," particularly where the withholding appears to result from not knowing about the thing withheld, as in this case. *Astrazeneca Pharm.*, 583 F.3d at 777.

Defendant has failed to establish each of the three elements of inequitable conduct due to failure to disclose material information, with respect to the alleged withholding of prior art patents. Moreover, as further evidence that summary judgment is appropriate with respect to this

first claim, the Court notes that it is undisputed that Defendant failed to identify who exactly it was who committed the inequitable conduct alleged.  The Federal Circuit has established that "to plead the 'circumstances' of inequitable conduct with the requisite 'particularity' under [Federal Rule of Civil Procedure] 9(b), the pleading must identify the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO."  *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1328-29 (Fed. Cir. 2009).  Because Defendant did not set forth who in particular it alleges withheld the prior art patents from the PTO, Defendant has not met the requisite "who, what, when, where, and how" standard.  Accordingly, summary judgment in favor of Plaintiff is appropriate on this first inequitable conduct claim.

### 2)       Withholding of Information About Stripping Knives

Next, Defendant alleges that Plaintiff engaged in inequitable conduct by intentionally withholding information about stripping knives and their uses during the prosecution of the '846 Patent.  Even if the Court assumes that the information allegedly withheld about stripping knives was in fact material, Defendant's inequitable conduct claim still fails, because it has failed to establish that Plaintiff knew about the alternative uses for stripping knives, and that Plaintiff intended to deceive the PTO.

Defendant has no evidence that anyone involved in the prosecution of the '846 Patent, with the exception of Ms. Porter, even knew about stripping knives or their uses.  As to Ms. Porter, Defendant has no evidence that she knew that stripping knives could be used for anything other than plucking or cutting pet hair.  Because the Porters were seeking the '846 Patent to protect their alleged invention of a pet grooming tool that would remove loose hair without cutting or pulling non-loose hair, it would not have been apparent to Ms. Porter that the stripping

54

knives, which she thought only plucked or cut hair, were material. Thus, Defendant cannot establish that anyone involved in the prosecution of the '846 Patent was actually aware of the alleged prior art and its materiality.

Additionally, Defendant cannot prove intent to deceive the PTO. The only "proof" Defendant offers of intent to deceive is that Plaintiff did not disclose to the PTO that stripping knives could be used for a purpose other than plucking or cutting pet hair. As set forth in the preceding section, "[i]ntent to deceive cannot be inferred simply from the decision to withhold." *Astrazeneca Pharm.*, 583 F.3d at 777.

Defendant's failure to establish knowledge or intent to deceive makes it appropriate to enter summary judgment in favor of Plaintiff on this inequitable conduct claim. Moreover, as further evidence that summary judgment is appropriate with respect to this second claim, the Court notes that it is undisputed that Defendant failed to identify who exactly it was who withheld the information about stripping knives and their uses from the PTO. As a result, Defendant has not met the requisite "who, what, when, where, and how" standard required for claims of inequitable conduct. *Exergen Corp.*, 575 F.3d at 1328-29. Accordingly, summary judgment in favor of Plaintiff is clearly appropriate on this second inequitable conduct claim.

### 3) Failure to Inform of Trade Show Seminar Attendance

In its next inequitable conduct claim, Defendant alleges that Plaintiff failed to inform the PTO during the prosecution of the '846 Patent that Ms. Porter attended a trade show seminar held by Pam Lauritzen, at which Ms. Lauritzen allegedly told participants that they could make a million dollars if they combined a #40 blade and a handle. This claim fails because Defendant is

unable establish that Ms. Porter actually attended such a trade show, and because there is no evidence of intent to deceive the PTO.

First, Defendant cannot establish materiality or knowledge. If no one associated with the patent or the invention attended the trade show seminar at issue, then information about that trade show seminar would not be material, and no one associated with the prosecution of the patent could be said to know about the advice given therein. That is precisely the situation here. It is undisputed that neither Ms. Porter nor Ms. Lauritzen recalls Ms. Porter attending a trade show seminar held by Ms. Lauritzen. Although Defendant states in its response to Plaintiff's Motion for Summary Judgment that "there is clearly admissible evidence including factual testimony from Pamela Lauritzen that Angela Porter, one of the alleged inventors, attended seminars taught by Ms. Lauritzen where Ms. Lauritzen taught that a '40 Blade' could be attached to a handle to make it easier to use during the deshedding process," Defendant fails to provide a supporting citation or other reference to verify this assertion. (Response, doc. #358, p.1). The only evidence of which the Court is aware (although not specifically cited by Defendant in its response), that *might* suggest Ms. Porter's attendance at a seminar held by Ms. Lauritzen is a series of registration forms for trade shows that are of questionable authenticity.[13] Moreover, proof that a person registered to attend a trade show does not establish that the person attended one particular seminar out of the numerous seminars offered at that trade show. Defendant's unsupported assertions and evidence of questionable authenticity are insufficient to establish by clear and

---

[13]The Court notes that one of the registration forms in particular is of questionable authenticity because the form, which was purportedly completed by Angela Porter, contains several unlikely mistakes, including the misspelling of her business's name and the misspelling of her own name.

convincing evidence that anyone involved in the prosecution of the '846 patent knew about the advice allegedly given by Pam Lauritzen at a trade show seminar, or the materiality of this information.

Additionally, Defendant is unable to establish that anyone involved in the prosecution of the '846 Patent intended to deceive the PTO by withholding information about Ms. Porter's alleged attendance at a trade show seminar in which Ms. Lauritzen told participants that combining a #40 blade and a handle would make them a million dollars. It is undisputed that Defendant inferred an intent to deceive on the part of Plaintiff, and that the sole support for this inference is Plaintiff's alleged failure to inform the PTO of Ms. Porter's attendance at the seminar. As set forth in the preceding section, "[i]ntent to deceive cannot be inferred simply from the decision to withhold." *Astrazeneca Pharm.*, 583 F.3d at 777.

Defendant has failed to establish that Ms. Porter actually attended such a trade show, and has failed to set forth any evidence of intent to deceive the PTO. Accordingly, summary judgment on this third inequitable conduct claim is appropriate. Moreover as further evidence of the appropriateness of summary judgment, the Court notes that it is undisputed that Defendant has not determined who, amongst those involved in the prosecution of the '846 Patent, withheld from the PTO that Ms. Porter allegedly attended a trade show seminar taught by Ms. Lauritzen. As a result, Defendant has not met the requisite "who, what, when, where, and how" standard required for claims of inequitable conduct. *Exergen Corp.*, 575 F.3d at 1328-29. Accordingly, summary judgment in favor of Plaintiff is clearly appropriate on this third inequitable conduct claim.

### 4) Failure to Provide Written Summary of Most Material References

Defendant's fourth inequitable conduct claim is that Plaintiff failed to provide the PTO with a written summary of the most material references submitted during the prosecution of the '076 Patent and the '540 Patent. This claim fails because Defendant is unable to establish a duty to provide such a summary. As set forth above, "inequitable conduct occurs when a patentee breaches his or her duty to the PTO of candor, good faith, and honesty." *Warner-Lambert Co. v. Teva Pharm. USA, Inc.*, 418 F.3d 1326, 1342 (Fed. Cir. 2005) (internal quotations omitted). It follows that where there is no duty to perform a particular task, failure to do so cannot amount to inequitable conduct.

Defendant asserts that those involved in the prosecution of the '076 Patent and the '540 Patent had a duty to call to the Examiner's attention the significance of certain references submitted to the PTO. In support of this assertion, Defendant cites to section 2004 of the Manual of Patent Examining Procedure ("MPEP"), which sets forth "Aids to Compliance With Duty of Disclosure." The procedures listed in this section are specifically described as "helpful suggestions" that "may not be required," and thus cannot be said to support the duty asserted. Additionally, the only case cited by Defendant in support of its assertion of duty is inapposite because it was decided on the basis of a now discontinued rule. *See Penn Yann Boats, Inc. v. Sea Lark Boats, Inc.*, 359 F. Supp. 948 (S.D. Fla. 1972), *aff'd*, 479 F.2d 1328 (5th Cir. 1973). Moreover, it is undisputed that Defendant has no evidence that any statute or any rule found in Title 37 of the Code of Federal Regulations requires patent applicants to provide written summaries of the documents known to be most material when submitting lists of documents to the PTO during patent prosecution. Because Defendant has failed to establish that there exists a

duty to highlight those references that are most material, Plaintiff's failure to do so cannot amount to inequitable conduct.[14]

The Court concludes that summary judgment is appropriate in favor of Plaintiff with respect to Defendant's inequitable conduct claim, based on Plaintiff's alleged failure to provide a written summary of the most material references. As further evidence of the appropriateness of summary judgment, the Court notes that it is undisputed that Defendant has not alleged who, amongst those involved in the prosecution of the '846 Patent, was responsible for burying the most material references in an attempt to hide them from the Examiner. As a result, Defendant has not met the requisite "who, what, when, where, and how" standard required for claims of inequitable conduct. *Exergen Corp.*, 575 F.3d at 1328-29. Accordingly, summary judgment in favor of Plaintiff is clearly appropriate on this fourth inequitable conduct claim.

### 5)      Failure to Provide Written Summary of Litigation Issues

Finally, Defendant claims that Plaintiff engaged in inequitable conduct by failing to provide the PTO with written summaries of litigation documents during the prosecution of the '076 Patent and the '540 Patent. Like the preceding claim that was also based on an alleged

---

[14]The Court notes that it is possible that Defendant intended to argue that Plaintiff violated the duty of candor by failing to submit all of the references to the Examiner. There is an established duty to disclose to the PTO all information known by individuals involved in a patent prosecution to be material to patentability, which would include references cited by alleged infringers in their defense. To the extent Defendant makes this argument, it also fails. Defendant has no evidence that Plaintiff withheld any references provided by alleged infringers from the PTO, and Defendant has no evidence that Plaintiff failed to identify any references cited in litigation on Information Disclosure Statements submitted to the PTO. It is undisputed that the Examiner indicated that she considered each of the references submitted. Thus, it is clear that Plaintiff complied with its duty to disclose all information known to be material to patentability.

failure to provide a written summary to the PTO, this claim fails because Defendant is unable to establish a duty to provide such a summary.

Defendant initially claimed that Plaintiff failed to disclose certain litigation documents. However, it is now undisputed that Defendant does not have evidence of any litigation issue that was raised during litigation involving FURminator patents that was not subsequently provided to the PTO by Plaintiff.  Based on the testimony of Edward Renner, it appears that Defendant's claim of inequitable conduct has morphed into one asserting a duty to provide a written summary of the issues presented in litigation and how the documents supplied to the PTO are related to those issues.  In support of this assertion, Defendant relies on section 2001.06(c) of the MPEP, which requires patent applicants to bring to the PTO's attention the existence of any litigation involving the subject matter for which a patent is being sought, as well as any other material information.  "Material information" is defined to include "evidence of possible prior public use or sales, questions of inventorship, prior art, allegations of 'fraud,' 'inequitable conduct,' and violation of 'duty of disclosure.'"  Manual of Patent Examining Procedure § 2001.06(c).  This standard does not require the patentee to provide a written summary of all of the issues involved in ongoing litigation to the PTO, and it is undisputed that Defendant is aware of no statute, caselaw, or provision in Title 37 of the Code of Federal Regulations that references providing such a written summary.  It is undisputed that Plaintiff has complied with the cited standard from MPEP, and Defendant has otherwise failed to establish a duty to provide a written summary of litigation issues.  Where there is no duty to perform a particular task, failure to do so cannot amount to inequitable conduct.

The Court concludes that summary judgment is appropriate in favor of Plaintiff with respect to Defendant's inequitable conduct claim, based on Plaintiff's alleged failure to provide a written summary of litigation issues. As further evidence of the appropriateness of summary judgment, the Court notes that it is undisputed that Defendant has not alleged who, amongst those involved in the prosecution of the '846 Patent, was responsible for withholding the written summary of litigation issues. As a result, Defendant has not met the requisite "who, what, when, where, and how" standard required for claims of inequitable conduct. *Exergen Corp.*, 575 F.3d at 1328-29. Accordingly, summary judgment in favor of Plaintiff is clearly appropriate on this final inequitable conduct claim.

Defendant has failed to establish each of its five inequitable conduct claims. Accordingly, the Court will grant Plaintiff's Motion for Summary Judgment on Count IV of Kim Laube & Co., Inc.'s Complaint Alleging Inequitable Conduct.

## VII.    REMAINING MOTIONS

Having determined that it is appropriate to grant each of Plaintiff's Motions for Summary Judgment, and deny Defendant's Partial Motion for Summary Judgment, the Court has resolved all of the material issues and bases for relief in this case. However, there remain a few pending motions, many of which are now moot, that the Court must briefly address.

### A.    PLAINTIFF'S MOTIONS TO STRIKE

There are six pending motions to strike that were filed by Plaintiff. In these motions, Plaintiff requests that the Court strike: 1) Table 1 from the August 14, 2009 Rebuttal Declaration of Christopher Ramsay, Ph.D. [doc. #291]; 2) the testimony of Edward Renner [doc. #330]; 3) the testimony of Kim Laube [doc. #331]; 4) the testimony of Pamela Lauritzen [doc. #332]; 5)

the testimony of Shawn Fox [doc. #334]; 5) the testimony of Dr. Christopher Ramsay [doc. #335]; and 6) Paragraph 7 from the July 30, 2009 Supplemental Declaration of Pamela Lauritzen [doc. #343]. With the exception of the testimony of Kim Laube, these motions address testimony and exhibits that were not relevant to the motions for summary judgment addressed in this Order. Mr. Laube's testimony was already stricken as a result of the Court's December 21, 2009 Order issuing sanctions. The Court relied on said Order herein, when applicable, to strike certain testimony and evidence. Accordingly, the Court concludes that each of Plaintiff's six pending motions to strike are moot, and thus will be denied as such.

### B. DEFENDANT'S MOTION *IN LIMINE*

There is one pending motion *in limine* that was filed by Defendant. In this Motion, Defendant requests that the Court enter an Order preventing Plaintiff's retained expert David H. Judson from offering expert testimony at trial on issues other than those specified in Paragraph 9(a) of his July 30, 2009 Expert Report. This Motion addresses testimony that was relied on in granting summary judgment in favor of Plaintiff. Thus, the Motion is moot and will be denied.

### C. DEFENDANT'S MOTION TO STRIKE FOR UNTIMELY REPLIES

There is also a pending motion to strike filed by Defendant, in which Defendant requests that the Court strike eleven replies filed by Plaintiff. Defendant argues that these replies were untimely because they were filed on May 4, 2010, eight days after Defendant filed its response briefs on April 26, 2010. However, Defendant's facts are inaccurate. According to this Court's Official Court Electronic Document Filing System, Defendant's response briefs were filed on

April 27, 2010, not April 26, 2010.[15]  Plaintiff had seven days, or until May 4, 2010, to file its

reply briefs.  Plaintiff met this deadline and its reply briefs were not untimely.  Thus, the Court

will deny Defendant's Motion.

### D. DEFENDANT'S MOTION FOR SANCTIONS

There is one final pending motion that this Court must address.  On July 8, 2010,

Defendant filed a Motion and Memorandum for Sanctions Based on Plaintiffs' Knowing and

Willful Filing of False Statements [doc. #384].  In this Motion, Defendant argues that the Court

should enter sanctions against Plaintiff similar to those previously entered against Mr. Laube.

Defendant asserts that Plaintiff made affirmative misrepresentations regarding Angela Porter's

attendance at a trade show seminar held by Pam Lauritzen.  Specifically, Defendant points to

Plaintiff's assertion in its Motion for Summary Judgment of No Inequitable Conduct that,

"[t]here is no proof that an inventor attended a trade show seminar where attendees were taught

to combine electric trimmer blades and handles or proof that such statements were ever made to

anyone."  (Motion, doc. #328, p.2).  Defendant argues that this statement is false because there is

proof to the contrary that Plaintiff was aware of, but claimed did not exist, specifically: Pam

Lauritzen's October 23, 2006 declaration and evidence, the testimony of Jerry Been, the

testimony of Michelle Greaves, the testimony of Nancy Schmid, and the testimony of Angela

Porter herself.

The Court has thoroughly reviewed the evidence that Defendant has cited in support of its

Motion, and finds that there is no basis for imposing sanctions.  The portion of Ms. Lauritzen's

---

[15]The Court notes that these briefs were filed shortly after midnight, but they were filed
on April 27, 2010, nonetheless.

declaration that Defendant relies on to establish Ms. Porter's seminar attendance is based on the previously discussed trade show registration forms. These forms only suggest that Ms. Porter attended the trade show, and are irrelevant to whether she actually attended one of the seminars held at the show. In fact, much of Defendant's argument is based on what appears to be a fundamental failure to appreciate the difference between attending a trade show and attending a trade show seminar. The testimony from Nancy Schmid and Angela Porter that Defendant cites is also about Ms. Porter's attendance at certain trade shows, not trade show seminars. Jerry Been's testimony is similar, although her testimony is questionable because it was given after Plaintiff filed its Motion for Summary Judgment of No Inequitable Conduct, and after prior counsel for Defendant represented to Plaintiff that it would not rely on Ms. Been's testimony, and therefore would not need to depose her. Finally, as to Michelle Greaves, her testimony was limited to a description of Pam Lauritzen's October 23, 2006 declaration, which she had examined in connection with her involvement in a related case. None of this evidence demonstrates that Plaintiff made an affirmative misrepresentation to the Court regarding the existing evidence of Ms. Porter's attendance at a trade show seminar taught by Ms. Lauritzen. To the extent that Defendant believes that the aforementioned evidence creates a genuine issue of material fact regarding Ms. Porter's attendance, that argument should have been made in response to Plaintiff's Motion for Summary Judgment of No Inequitable Conduct.

Thus, the Court concludes that Defendant's Motion for Sanctions has no merit, and should be denied. Plaintiff's request for fees incurred in responding to what it asserts is a frivolous motion will also be denied at this time.

## VIII.   CONCLUSION

The Court considered multiple motions in this Memorandum and Order.  To summarize, the Court has found that summary judgment is appropriate in favor of Plaintiff on its claims of infringement.  The Court has also found that summary judgment is appropriate in favor of Plaintiff with respect to each of Defendant's claims against Plaintiff.  The remaining motions in this case were considered on an as-needed basis, or were dismissed as moot.  In the end, the Court finds it proper to enter judgment in favor of Plaintiff, and against Defendant.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Amended Motion to Exclude or Limit Testimony of Robert O. Schick and Memorandum in Support [doc. #333] is **GRANTED**, **in part**, as set forth above.

**IT IS FURTHER ORDERED** that Defendant Kim Laube & Co., Inc.'s Motion for Partial Summary Judgment Relating to No Evidence of Infringement [doc. #341] is **DENIED**, and FURminator's Motion for Summary Judgment of Infringement as to the Accused Laube Tools [doc. #322] is **GRANTED**.  The Court enters judgment in favor of Plaintiff FURminator, Inc., and against Defendant Kim Laube & Co., Inc., on Plaintiff's infringement claims.

**IT IS FURTHER ORDERED** that FURminator's Amended Motion for Summary Judgment of Validity over Kim Laube & Co., Inc.'s Asserted References under 35 U.S.C. §§ 102 and 103 and 35 U.S.C. § 112 [doc. #324] is **GRANTED**.  All claims of Defendant Kim Laube & Co., Inc. regarding invalidity are **DISMISSED**, **with prejudice**.

**IT IS FURTHER ORDERED** that FURminator's Amended Motion for Summary Judgment on Counts V through X of Kim Laube & Co., Inc.'s Complaint [doc. #326] is

**GRANTED**.  Defendant's claims of injurious falsehood and product disparagement (count V), tortious interference with economic relations (count VI), tortious interference with prospective economic advantage (count VII), defamation per se (count VIII), common law unfair competition (count IX), and unfair competition under the Lanham Act (count X) are **DISMISSED**, **with prejudice**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment on Count IV of Kim Laube & Co., Inc.'s Complaint Alleging Inequitable Conduct [doc. #328] is **GRANTED**.  Defendant's claims of inequitable conduct (count IV) are **DISMISSED**, **with prejudice**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Strike Table 1 from the August 14, 2009 Rebuttal Declaration of Christopher Ramsay, Ph.D. [doc. #291]; Plaintiff's Amended Combined Motion and Memorandum to Exclude Testimony of Edward Renner [doc. #330]; Plaintiff's Amended Combined Motion and Memorandum to Exclude Testimony of Kim Laube Based on the Court's December 21, 2009 Order and Because Mr. Laube's Testimony Does Not Meet the Requirements of *Daubert* [doc. #331]; Plaintiff's Amended Combined Motion and Memorandum to Exclude Testimony of Pamela Lauritzen Based on the Court's December 21, 2009 Order and Because Ms. Lauritzen's Testimony Does Not Meet the Requirements of *Daubert* [doc. #332]; Plaintiff's Amended Motion to Exclude or Limit Testimony of Shawn Fox and Memorandum in Support [doc. #334]; Plaintiff's Motion to Exclude or Limit Testimony of Dr. Christopher Ramsay and Memorandum in Support [doc. #335]; and Plaintiff's Amended Motion and Memorandum in Support to Strike or in the Alternative to Exclude Paragraph 7 from

the July 30, 2009 Supplemental Declaration of Pamela Lauritzen [doc. #343] are **DENIED**, **as moot**.

IT IS FURTHER ORDERED that Defendant's Motion *In Limine* to Exclude Testimony from Plaintiff's Retained Expert David H. Judson [doc. #344] is **DENIED**, **as moot**.

IT IS FURTHER ORDERED that Kim Laube & Co.'s Motion [to] Strike Untimely Replies [doc. #382] is **DENIED**.

IT IS FURTHER ORDERED that Kim Laube & Co., Inc.'s Motion and Memorandum for Sanctions Based on Plaintiff's Knowing and Willful Filing of False Statements [doc. #384] is **DENIED**.

Dated this 15th Day of December, 2010.

E. RICHARD WEBBER
SENIOR UNITED STATES DISTRICT JUDGE